THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(B) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF LIQUIDATION DESCRIBED HEREIN.   ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| L REIT, LTD. *et al.* | § | CASE NO. 18-36881-H2-11 |
| | § | (Jointly Administered) |
| Debtors. | § | |

[PROPOSED] JOINT DISCLOSURE STATEMENT UNDER
11 U.S.C. § 1125 AND BANKRUPTCY RULE 3016 IN
SUPPORT OF PLAN OF REORGANIZATION OF DEBTORS

THIS JOINT DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE.  THIS JOINT DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTORS' JOINT PLAN OF REORGANIZATION. ALL CREDITORS ARE URGED TO READ THE JOINT DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.

ON _____, 2019 THE BANKRUPTCY COURT APPROVED THIS JOINT DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(B) OF THE BANKRUPTCY CODE.  SOLICITATION OF ACCEPTANCE OR REJECTION OF THE JOINT PLAN OF REORGANIZATION HEREIN DESCRIBED AND ATTACHED AS EXHIBIT A, IS BEING SOUGHT FROM CREDITORS WHOSE CLAIMS AGAINST THE DEBTORS THAT ARE IMPAIRED UNDER THE JOINT PLAN OF REORGANIZATION. CREDITORS ENTITLED TO VOTE ON THE JOINT PLAN OF REORGANIZATION ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT UPON COMPLETION IN THE ENVELOPE ADDRESSED TO HOOVER SLOVACEK LLP., ATTENTION: EDWARD L. ROTHBERG/MELISSA A. HASELDEN, 5051 WESTHEIMER, SUITE 1200, HOUSTON, TEXAS 77056, NOT LATER THAN _____, 2019 AT _____.M. HOUSTON TIME.

## TABLE OF CONTENTS

**ARTICLE I Introduction and Summary**.................................................................. 1

   A.    General Information Concerning Disclosure Statement and Plan ................... 1

   B.    Disclaimers ................................................................................................... 2

   C.    Answers to Commonly Asked Questions. .................................................... 3

   D.    Recommendation of the Debtors to Approve the Plan ................................... 6

   E.    Rules of Interpretation ................................................................................. 7

   F.    Overview of Plan ......................................................................................... 7

**ARTICLE II History Of Business And Chapter 11 Case** ...................................... 9

   A.    Overview of the Debtors' Business ............................................................. 9

   B.    Events Leading to the Filing of this Chapter 11 Case ................................ 10

   C.    L REIT's Financial Situation as of Petition Date ...................................... 11

   D.    Beltway's Financial Situation as of Petition Date ...................................... 16

   E.    Operations During Bankruptcy .................................................................. 16

   F.    Significant Events in this Chapter 11 Case ................................................ 16

**ARTICLE III Classification of Claims Under the Plan** ...................................... 18

   A.    Administrative Expenses ........................................................................... 18

   B.    Classification of Secured and Unsecured Claims ...................................... 19

   C.    Treatment of Claims and Interests Under Plan .......................................... 20

   D.    Other Claims Matters ................................................................................ 21

**ARTICLE IV Means of Execution of Plan** .......................................................... 23

   A.    Sources of Consideration for Plan Distributions ....................................... 23

   B.    Release of Liens. ........................................................................................ 23

   C.    Sale Free and Clear. ................................................................................... 23

   D.    Distribution of Net Sale Proceeds. ............................................................. 23

   E.    Distribution of Other Assets and Net Litigation Proceeds. ........................ 23

   F.    Funding of Plan. ........................................................................................ 24

   G.    Disbursing Agent. ..................................................................................... 24

   H.    Vesting of Property of the Estate in the Debtors. ....................................... 24

   I.    Preservation of Claims and Causes of Action............................................ 24

   J.    Other Provisions of the Plan ...................................................................... 26

   K.    Directors and Officers of the Debtors. ....................................................... 29

L.      Claims Bar Dates .................................................................................. 29

**ARTICLE V Acceptance and Confirmation of the Plan.................................. 30**

A.      Confirmation Hearing ........................................................................ 30

B.      Requirements of Confirmation .......................................................... 30

C.      Confirmation without Acceptance of All Impaired Classes ........................................ 33

**ARTICLE VI Voting Procedures ................................................................ 34**

A.      Ballots and Voting Deadline ............................................................. 34

B.      Holders of Claims Entitled to Vote .................................................. 35

C.      Bar Date for Filing Proofs of Claim ................................................ 35

D.      Definition of Impairment .................................................................. 36

E.      Classes Impaired Under the Plan ..................................................... 37

F.      Information on Voting and Ballots .................................................... 37

**ARTICLE VII Alternatives ......................................................................... 37**

A.      Conversion to Chapter 7 ................................................................... 37

B.      Dismissal........................................................................................... 38

C.      No Assurance of Either .................................................................... 38

D.      Preferences and Fraudulent Transfers .............................................. 38

**ARTICLE VIII Risks Posed to Creditors....................................................... 39**

**ARTICLE IX Certain Federal Income Tax Consequences ............................ 39**

A.      Tax Consequences to Creditors ........................................................ 39

**ARTICLE X Management Of The Debtors ................................................... 40**

A.      Directors and Officers of the Debtors............................................... 40

**ARTICLE XI Conclusion............................................................................. 40**

# ARTICLE I
# INTRODUCTION AND SUMMARY

A.     **General Information Concerning Disclosure Statement and Plan**

L REIT, Ltd. ("**L REIT**") and Beltway 7 Properties, Ltd. ("**Beltway**" and collectively with L REIT, the "**Debtors**"), debtors and debtors-in-possession herein, submit this Joint Disclosure Statement under 11 U.S.C. § 1125 in support of their Joint Plan of Reorganization (the "**Disclosure Statement**") under Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016.  A copy of the Joint Plan of Reorganization (the "**Plan**") is attached as **Exhibit A** for your review.  All terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

The Debtors filed petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"), on December 5, 2018 and have retained Hoover Slovacek LLP as bankruptcy counsel.  The Debtors have prepared this Disclosure Statement to disclose that information which, in their opinion, is material, important, and necessary to an evaluation of the Plan.  Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement must be presented to and approved by the Bankruptcy Court.  Such approval is required by statute and does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

The Debtors seek to confirm the Plan which seeks sale of substantially all of the assets of the Debtors and distribution of the Net Sale Proceeds as provided herein and in the Plan.  As described in this Disclosure Statement, the Debtors believe that the procedures set forth in the Plan and the Bidding Procedures will provide the highest and best recovery for the Debtors' estates and creditors.

A bankruptcy court's confirmation of the Plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or interest holder in a debtor, and any other entities and persons as may be ordered by the bankruptcy court to the terms of the confirmed plan, whether or not such creditor or interest holder is impaired under or has voted to accept the plan or receives or retains any property under the plan, through an order confirming the plan (the "**Confirmation Order**").  Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any Claim (as that term is defined in the Plan) arising before the Effective Date (as defined herein and in the Plan) and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims.  Under the Plan, Claims and Interests are divided into groups called "Classes" according to their relative priority and other criteria.

The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code.  Except to the extent that a Holder of an Allowed Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge

of and in exchange for such Claim, each Holder of an Allowed Claim or Allowed Interest with regard to the Debtors will receive the same recovery (if any) provided to other Holders of Allowed Claims or Allowed Interests in the applicable Class, and will be entitled to their Pro Rata share of consideration available for distribution to such Class (if any).

Notwithstanding any other provision in the Disclosure Statement or Disclosure Statement Order, the Bankruptcy Court makes no finding or ruling in the Disclosure Statement Order, other than with respect to the adequacy of the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, with respect to (a) the negotiations, reasonableness, business purpose, or good faith of the Plan, or as to the terms of the Plan (or the treatment of any class of claims thereunder and whether those claims are or are not impaired) for any purpose, (b) whether the Plan satisfies any of the requirements for confirmation under Section 1129 of the Bankruptcy Code, or (c) the standard of review or any factor required for approval of the Confirmation of the Plan. Any objections or requests served in connection with the Plan are hereby reserved and not waived by entry of the Disclosure Statement Order; provided, however, that nothing in the Disclosure Statement or the Disclosure Statement Order will preclude the Debtors or any other party in interest that is the subject of such objection or discovery requests from seeking to overrule such objections or limit or otherwise overrule such discovery requests.

**Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety.  As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement of risks, uncertainties, factors or projections. Certain of these risks, uncertainties, and factors are described in Article VIII of this Disclosure Statement, entitled "Risks Posed to Creditors" which begins on page 39.**

B.      **Disclaimers**

The material herein contained is intended solely for the use of known creditors and interest holders of the Debtors and may not be relied upon for any purpose other than a determination by them of how to vote on the Plan.  As to Contested Matters, Adversary Proceedings and other actions or threatened actions, this Disclosure Statement will not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations under Rule 408 of the Federal Rules of Evidence.  This Disclosure Statement will not be admissible in any non-bankruptcy proceeding nor will it be construed as advice on the tax, securities or other legal effects of the Plan as to the Holders of Claims against or equity interests in the Debtors.

To ensure compliance with Treasury department circular 230, each holder of a Claim or Interest is hereby notified that: (a) any discussion of U.S. Federal Tax issues in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon, by any Holder for the purpose of avoiding penalties that may be imposed upon a holder under the Tax Code; (b)

such discussion is included hereby by the Debtors in connection with the promotion or marketing (within the meaning of Circular 230) by the Debtors of the transactions or matters addressed herein; and (c) each Holder should seek advice based upon its particular circumstances from an independent tax advisor.

The Debtors compiled the information contained in this Disclosure Statement from records available to it, including, but not limited to, pleadings and reports on file with the Bankruptcy Court, loan agreements and business records. Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments. While the Debtors have made every effort to retain the meaning of such other instruments or the portions transposed, it urges that any reliance on the contents of such other instruments should depend on a thorough review of the instruments themselves. Except as specifically noted, there has been no independent audit of the financial information contained in this disclosure statement. Neither the Debtors nor counsel for the Debtors can warrant nor represent that the information contained in this disclosure statement is without inaccuracies. Neither the Debtors nor its counsel has verified the information contained in this Disclosure Statement, although they do not have actual knowledge of any inaccuracies.

Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made, except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. No other party has been authorized to utilize any information concerning the Debtors or their affairs, other than the information contained in this Disclosure Statement, to solicit votes on the Plan. Creditors and holders of equity interest should not rely on any information relating to the Debtors, other than that contained in this Disclosure Statement and the exhibits attached hereto.

No representations concerning the Debtors, or the Plan are authorized other than those that are set forth in this Disclosure Statement. Any representations or inducements made by any person to secure your vote which are other than those contained herein should not be relied upon, and such representations or inducements should be reported to counsel for the Debtors who will deliver such information to the Bankruptcy Court.

**IF THE REQUISITE VOTE IS ACHIEVED FOR EACH CLASS OF IMPAIRED CLAIMS, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

### C.      Answers to Commonly Asked Questions.

As part of the Debtors' efforts to inform Creditors and Interest Holders regarding the Plan and the Plan confirmation process, the following summary provides answers to questions which parties who receive a disclosure statement often ask.

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

### 1.       Who are the Debtors?

The Debtors are L REIT, Ltd. and Beltway 7 Properties, Ltd.  On December 5, 2018 (the "**Petition Date**"), the Debtors each filed voluntary cases under Chapter 11 of the Bankruptcy Code which were assigned Case No. 18-36881-H2-11 and 18-86883-H2-7 (the "**Bankruptcy Cases**") in the Bankruptcy Court.  An order granting joint administration of the Bankruptcy Cases was entered on December 6, 2018.

### 2.       What is a Chapter 11 bankruptcy?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their assets in a controlled fashion.  The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed. During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the Bankruptcy Court orders the appointment of a trustee.  No trustee has been appointed in the Debtors' cases.

### 3.       If the Plan governs how my Claim or Interest is treated, what is the purpose of this Disclosure Statement?

In order to solicit votes on a bankruptcy plan, the Bankruptcy Code requires that the proponent of the plan first prepare a disclosure statement that provides sufficient information to allow creditors and interest holders to make an informed decision about the plan.  The disclosure statement and plan are distributed to creditors and interest holders only after the bankruptcy court has approved the disclosure statement and determined that the disclosure statement contains information adequate to allow creditors and interest holders to make an informed judgment about the plan.  At that time, creditors and interest holders whose claims and interests are impaired under the plan also receive a voting ballot.

### 4.       Has this Disclosure Statement been approved by the Bankruptcy Court?

On _____, 2019, the Bankruptcy Court conditionally approved this Disclosure Statement as containing adequate information.  "Adequate information" means information of a kind, and in sufficient detail, as far as is practicable considering the nature and history of the Debtors' businesses and the condition of the Debtors' books and records, to enable a hypothetical investor typical of Holders of Claims or Interests of the relevant Classes to make an informed judgment whether to vote to accept or reject the Plan.

**5.** **How do I determine how my Claim or Interest is classified?**

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest.  Under the Plan, Claims and Interests are classified into a series of classes. The pertinent articles and sections of the Disclosure Statement and Plan disclose, among other things, the treatment that each class of Claims or Interests will receive if the Plan is confirmed.

**6.** **Why is confirmation of the Plan important?**

The Bankruptcy Court's confirmation of the Plan is a condition to the Debtors carrying out the treatment of Creditors and Interest Holders under the Plan.  Unless the Plan is confirmed, and any other conditions to confirmation or to the effectiveness of the Plan are satisfied, all parties are legally prohibited from satisfying Claims or Interests as provided in the Plan.  Put more simply, confirmation of a plan in Chapter 11 is required before any distributions can be made to creditors absent a court order providing otherwise.

**7.** **What is necessary to confirm the Plan?**

Under applicable provisions of the Bankruptcy Code, confirmation of the Plan requires that, among other things, at least one Class of impaired Claims or Interests vote to accept the Plan. Acceptance by a Class of Claims or Interests means that at least two-thirds in the total dollar amount of the Allowed Claims or Interests, and more than one-half in number of the Allowed Claims, actually voting in the class vote in favor of the Plan.  Because only those Claims or Interests who vote on the Plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, the Plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims/interests.  Besides acceptance of the Plan by each Class of impaired creditors or interests, the Bankruptcy Court also must find that the Plan meets a number of statutory tests before it may confirm the Plan.  These requirements and statutory tests generally are designed to protect the interests of Holders of impaired Claims or Interests who do not vote to accept the Plan but who will nonetheless be bound by the Plan's provisions if the Bankruptcy Court confirms the Plan.

Even if all classes of claims and interests accept a plan, a bankruptcy court may nonetheless still deny confirmation. Bankruptcy Code Section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible.  The "best interests" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  A plan must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization.

In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied as conditions to confirmation.

If one or more Classes vote to reject the Plan, the Debtors may still request that the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code.   To confirm a plan not accepted by all classes, the plan proponent must demonstrate that the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and that has not accepted, the plan.   This method of confirming a plan is commonly called a "cramdown."

### 8.      Is there a Committee in this case?

No.  The United States Trustee is responsible for soliciting a committee of creditors holding unsecured claims pursuant to Section 1102(a)(1) of the Bankruptcy Code and sought to solicit a committee in this case.  On January 22, 2019, the US Trustee filed a notice of inability to appoint a committee.

### 9.      When is the deadline for returning my ballot?

The Bankruptcy Court has directed that, to be counted for voting purposes, your ballot must be received by the Debtors' Counsel by **5:00 p.m. Central Standard Time on _____, 2019.**

After completion of the ballot, creditors should return the executed ballot in the self-addressed envelope to:

**L REIT, LTD. AND BELTWAY 7 PROPERTIES, LTD.**
**C/O EDWARD L. ROTHBERG/MELISSA A. HASELDEN**
**HOOVER SLOVACEK LLP**
**5051 WESTHEIMER, SUITE 1200**
**HOUSTON, TX  77056**

### D.      Recommendation of the Debtors to Approve the Plan

The Debtors approved the solicitation of acceptances of the Plan and all of the transactions contemplated thereunder.   In light of the benefits to be attained by the Holders of Claims and Interests contemplated under the Plan, the Debtors recommend that such Holders of Claims and Interests vote to accept the Plan.   The Debtors have reached this decision after considering the alternatives to the Plan that are available to the Debtors. These alternatives include liquidation under chapter 7 of the Bankruptcy Code or reorganization under chapter 11 of the Bankruptcy Code with an alternative Plan of Reorganization.   The Debtors determined, after consulting with their financial and legal advisors, that the transactions contemplated in the Plan would likely result in a distribution of greater value to creditors than other alternatives.

### E.     Rules of Interpretation

The following rules for interpretation and construction will apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, will mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to a person or entity as a holder of a Claim or Interest includes that person or entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement; (6) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits to the Disclosure Statement; (7) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (9) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in Section 102 of the Bankruptcy Code will apply; (10) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement, Plan, or exhibits to the Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like will mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) will apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement will occur on a day that is not a Business Day, then such transaction will instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in the Disclosure Statement to monetary figures will refer to currency of the United States of America.

### F.     Overview of Plan

An overview of the Plan is set forth below.  This overview is qualified in its entirety by reference to the Plan. If the Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date. A summary of certain risk factors relating to the Plan is set forth below and in Article VIII of this Disclosure Statement.

The Plan should be read carefully and independently of this Disclosure Statement.  The following analysis of the Plan is intended to provide a context for understanding the remainder of

this Disclosure Statement and to assist in an understanding of the Plan and the proposed treatment of the Creditors.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of business. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

A copy of the Plan is attached as **Exhibit A**. Generally, if the Plan is confirmed by the Bankruptcy Court and consummated:

A.      Administrative Claims of Professionals and the United States Trustee will be paid in full in cash, from the Net Sale Proceeds;

B.      the Allowed Secured Claim of the Secured Noteholder will either (i) be paid in full upon sale f the Real Properties or (ii) be paid pursuant to the terms of its Loan Agreement if the debt is assumed by the purchaser of the Real Properties;

C.      after payment of the Secured Noteholder, the Allowed Secured M&M Claims will be paid in full upon sale of the Real Properties without interest;

D.      thereafter Allowed Claims of L REIT's General Unsecured Creditors will be paid on a pro rata basis from the Net Sale Proceeds until paid in full without interest;

E.      thereafter, the Allowed Secured Claim of the Mezzanine Lender will be paid from the remaining Net Sale Proceeds or (ii) be paid pursuant to the terms of its Loan Agreement if the debt is assumed by the purchaser of the Real Properties;

F.      thereafter, all Allowed Claims of Beltway's General Unsecured Creditors, if any, will be paid on a pro rata basis from the remaining Net Sale Proceeds without interest;

G.      after payment in full of Beltway's General Unsecured Creditors, if any, the Unsecured Affiliate Claims will be paid on a pro rata basis from the remaining Net Sale Proceeds with interest;

H.      after payment in full of the Unsecured Affiliate Claims, any surplus proceeds will be distributed to the Holders of Interests in L REIT proportionate to their Interest; and

I.      if any distribution is made to Beltway on account of its Interest in L REIT will be distributed to Holders of Interest in Beltway proportionate to their Interest.

## ARTICLE II
## HISTORY OF BUSINESS AND CHAPTER 11 CASE

### A.      Overview of the Debtors' Business

L REIT is a Texas limited partnership located in Houston, Texas and formed as a special purpose entity in 2012 for the purpose of acquiring, developing, and owning a commercial property in Houston, Harris County.  L REIT owns seven (7) office buildings located at 7840, 7850, 7900, 7904, 7906, 7908 N. Sam Houston Pkwy W and 10740 N. Gessner Dr. Houston, Texas (the "**Real Properties**").  L REIT, LLC, a Delaware limited liability company, retains a 1% ownership interest in L REIT and serves as its general partner.  Beltway 7 Properties, Ltd. ("**Beltway 7**"), the co-debtor in these Chapter 11 Cases, retains a 99% ownership interest in L REIT and is its sole limited partner.

Beltway 7 Management, LLC, a Delaware limited liability company, retains a 1% ownership interest in Beltway 7 and serves as its general partner.  Mohammad Nasr, through his entities was the developer of the Real Properties, is the sole limited partner of Beltway 7.  Beltway 7 has no operations or assets other than its ownership of the L REIT interests.

A chart showing this ownership structure is provided below:



The Real Properties comprise a Class A commercial office complex situated on a 14-acre tract of real property and strategically located in North Houston along Beltway 8 near Heron Lake Estates.  The Real Properties were originally designed and developed between 2002 to 2010 as individual projects by Mohammad Nasr.  Each building was owned by a separate entity until 2012, when, in connection with financing from the Secured Noteholder, the separate properties were transferred to newly formed L REIT.  The aggregate net rentable area for the Real Properties is about 315,000 sq. feet, detailed by building in the chart below:

| Property | Address | Size |
|----------|---------|------|
| Par-O | 7840 N. Sam Houston Pky W | 35,214 sq. ft. |
| Turfway | 7850 N Sam Houston Pky W | 42,229 sq. ft. |
| Sandtrap | 7900 N Sam Houston Pky W | 35,512 sq. ft. |
| Sandtrap II | 7904 N Sam Houston Pky W | 42,200 sq. ft. |
| Sandtrap III | 7906 N Sam Houston Pky W | 41,038 sq. ft. |
| Sandtrap IV | 7908 N Sam Houston Pky W | 42,310 sq. ft. |
| Sandtrap V | 10740 N. Gessner Dr. | 75,840 sq. ft. |

The buildings range in size from 35,000 sq. feet to 76,000 sq. feet, with floor plans from 8,500 - 19,000 sq. feet. This diversity allows for larger tenants the security of full floors while still accommodating smaller tenants.  At present, the Real Properties have about 67,220 sq. ft of vacant lease space.

The Real Properties have the following available amenities either adjacent or on-site: Mexican Café/restaurant, Heron Lakes Golf Course & Pro Shop, 114 room hotel (Staybridge Suites), property management on-site, banking facility, water features and a jogging trail. The Real Properties also provide exceptional access to Beltway 8, SH 249, 290 and IAH airport.  The Real Properties are the Debtors' only significant assets.

The Real Properties are managed by Hollister Property, Inc. ("**Hollister**"), a Texas corporation in which Mr. Nasr is a shareholder.  Hollister manages the Real Properties in connection with a management agreement.

### B.      Events Leading to the Filing of this Chapter 11 Case

As a result of tenants leaving the Real Properties, L REIT's cash flows began to suffer.  As a stop gap measure, Mr. Nasr personally covered most of the monthly deficiencies for L REIT to ensure that the debt service and current operating were expenses paid.  After approximately one (1) year of covering the shortfalls, Mr. Nasr was no longer able to fund the shortfalls for L REIT.

During the last few months prior to the bankruptcy filing, L REIT consulted with several real estate brokers to market the Real Properties, and attempted to work with the various lenders to secure forbearances in payment terms in order to provide additional time for L REIT to increase occupancy levels or sell the Real Properties.  No global agreement could be reached.   Facing eventual foreclosure on the Real Properties by the lenders or execution on the pledge of Beltway 7's interest in L REIT by the Mezzanine Lender, the Debtors were left with no alternative but to seek protection under Chapter 11 of the Bankruptcy Code.

This bankruptcy was filed to allow the Debtors sufficient time to market and sell the Real Properties, with proceeds to be distributed in accordance with the priorities established in the Bankruptcy Code and set out herein.  As set forth in this Disclosure Statement and the Plan, the

Debtors believe selling the Real Properties in accordance with the Bidding Procedures will provide the greatest return to creditors.

### C.   L REIT's Financial Situation as of Petition Date

#### 1.   L REIT's Pre-Petition Assets

As of the filing date L REIT's principal assets consisted of the Real Properties which includes the valuable interests in the commercial leases with its tenants The following is a table summarizing the value of these assets reflected on the schedules as of the Petition Date:

| Property | Scheduled Value |
|---|---|
| Cash and Bank Deposits[1] | $1,389,670.34 |
| Real Properties | $74,000,000.00 |
| Outstanding Rents Owed | $286,681.05 |
| **Total** | **$75,676,351.39** |

As part of its evaluation of the Real Properties, Avison prepared a preliminary valuation of the Real Properties.  Based on an occupancy rate of 77.64% and NOI of $3,667,924 per year as of the Petition Date, Avison believed the Real Properties could sell at a price ranging between $70,000,000 and $77,000,000 depending on the capitalization rate.  The estimates provided by Avison are shown below:

**CURRENT NOI BASED ON OWNER PROVIDED INFORMATION**
HERON LAKES
CAP RATE VALUATION

| Going-in Cap Rate | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% |
|---|---|---|---|---|---|
| Current NOI | $3,667,924 | $3,667,924 | $3,667,924 | $3,667,924 | $3,667,924 |
| Value | $81,509,413 | $77,219,444 | $73,358,472 | $69,865,211 | $66,689,520 |
| PSF | $258.94 | $245.32 | $233.05 | $221.95 | $211.86 |

| | |
|---|---|
| TOTAL SF | 314,776 |
| OCCUPANCY | 77.64% |
| CURRENT NOI | $3,667,924 |

---

[1] Of these funds $1,305,236.61 was held by the Secured Noteholder as part of its Loan Agreement with L REIT.  According to the Secured Noteholder's monthly statements, it held $1,099,802.24 as part of a Property Tax Escrow, $43,845.21 in a Property Insurance Escrow, $123,893.43 in a Reserve Escrow Account and $38,695.73 in a Lockbox account.  On or about January 31, 2019, pursuant to an order of the Bankruptcy Court, funds of $1,069,296.52 in the Property Tax Escrow were used to pay the various taxing authorities with secured claims against the Real Properties.

Since the Petition Date, Avison has assisted in obtaining several renewals and new leases for the space.  Based on the renewals and leases as well as prospective new leases, Avison anticipates the value of the Real Properties may increase the price range between $71,000,000 and $78,500,000.

**NOI BASED ON NEW EXPECTED LEASES***
HERON LAKES
CAP RATE VALUATION

| Going-in Cap Rate | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% |
|---|---|---|---|---|---|
| Current NOI | $3,738,747 | $3,738,747 | $3,738,747 | $3,738,747 | $3,738,747 |
| Value | $83,083,265 | $78,710,462 | $74,774,939 | $71,214,227 | $67,977,217 |
| PSF | $263.94 | $250.05 | $237.55 | $226.24 | $215.95 |

| TOTAL SF | 314,776 |
|---|---|
| OCCUPANCY | 79.31% |
| CURRENT NOI | $3,738,747 |

*Assumptions:
Please note that these leases have not been executed/ we have not received executed copies of these leases. Terms are subject to change.

| | | Change to NOI |
|---|---|---|
| 1 | 7850 - 102: Granite Harbor renewal at $22.50 NNN, 3% annual bumps, 5/0 Years, As Is. (Owner to share lease) | $9,270 |
| 2 | 7850 - 310: Surge Energy take over Rusty Brent's space until 04/25 at $18.00 | $36,792 |
| | 7904 - 315: Rusty Brent may take relocate to this space at | |
| 3 | $19.85 | -$7,634 |
| 4 | 10740 - 320: New deal for Oil & Gas tenant at $18 NNN, $0.50 annual bumps, 5/8 Years, 8 mo. free | $32,372 |
| | | $70,800 |

L REIT also scheduled interests in tenant deposits in the amount of $87,856.48, although scheduled as an asset, these amounts may belong to L REIT's tenants under Texas law.

L REIT also scheduled various claims and lawsuits against former tenants and service providers.  Given the contingent nature of these claims, their actual value is unknown.

### 2. L REIT's Pre-Petition Liabilities

#### (a) Secured Noteholder

In 2012, L REIT entered into a mortgage loan agreement with JPMorgan Chase Bank ("**JP Morgan**") in the original principal balance of about $52 million, secured by a first lien on substantially all the assets of L REIT, including, but not limited to, the Real Properties and related rents.  In 2014, L REIT refinanced this obligation with JP Morgan through a new a loan in the principal amount of $59 million (the "**Secured Loan**").  The Secured Loan is actually made up of two (2) parts.  The first loan is owed by L REIT to Wells Fargo Bank, National Association as Trustee for the registered holders of JPMBB Commercial Mortgage Securities Trust 2014-C26, Commercial Mortgage Pass-Through Certificates, Series 2014-C26 ("**Secured Noteholder**") in the approximate amount of $52 million (the "**Secured Loan**").  The second loan is owed by Beltway 7 to Annaly CRE Holdings, LLC ("**Mezzanine Lender**" and collectively with the Secured Noteholder the "**Lenders**") as a mezzanine loan in the amount of $7 million (the "**Mezzanine Loan**"). The Secured Noteholder's Secured Loan is being managed by PNC Real

Estate and is serviced by Midland Loan Services ("**Midland**"). The Secured Loan is secured by a first lien on substantially all the assets of L REIT, including, but not limited to, the real property and improvements constituting the Real Properties and related rents and is fully assumable. The Mezzanine Loan is secured by the partnership interest of Beltway 7 which is the 99% limited partner of L REIT.

As of the Petition Date, the Debtors estimated the outstanding balance of the Secured Loan at approximately $50.5 million. Debtors also estimated the Secured Noteholder held a balance of $1.4 million in various reserve accounts. The maturity date of the Secured Loan is December 1, 2024.

The Secured Noteholder has filed Proof of Claim No. 3 in the aggregate amount of $56,595,034.50 after offsets. In its claim, the Secured Noteholder reflects the current principal balance of the Secured Loan is $50,420,311.87. It also assets Default Interest totaling $1,985,638.73 as arrearages, a Prepayment Premium of $5,030,822.41 and Special Servicing Fees of $504,203.12. The Debtors dispute that the Default Interest, Prepayment Premium and Special Servicing Fees amounts are owed.

### (b)    Secured Claims of Taxing Authorities

On the Petition Date, L REIT was obligated to pay property taxes on the Real Properties for the 2018 tax year to the Harris County Tax Assessor and the Cypress Fairbanks ISD Tax Assessor (the "**Taxing Authorities**"). These amounts are secured by a statutory lien which primes the lien of the Secured Noteholder. The outstanding amounts owed to the Taxing Authorities (collectively the "**Taxes**") are summarized as follows:

| Property Address | Tax Liability |
|---|---:|
| 7840 N. Sam Houston Pkwy W 77064 (Acct. #120-591-002-0053) | $122,558.65 |
| 7850 N. Sam Houston Pkwy W 77064 (Acct. #123-976-001-0001) | $149,610.28 |
| 7900 N. Sam Houston Pkwy W 77064 Acct. #120-591-001-0047) | $109,690.12 |
| 7904 N. Sam Houston Pkwy W 77064 (Acct. #120-591-001-0051) [2] | $136,822.77 |
| 7904 N. Sam Houston Pkwy W 77064 (Acct. #120-591-001-0052) | $9,348.23 |
| 7906 N. Sam Houston Pkwy W 77064 (Acct. #125-185-001-0001) | $129,415.59 |
| 7908 N. Sam Houston Pkwy W 77064 (Acct. #120-591-001-0053) | $141,798.80 |
| 7908 N. Sam Houston Pkwy W 77064 (Acct. #120-591-001-0058) | $3,372.71 |
| 10740 N Gessner Rd 77064 (Acct. #120-591-001-0055) | $235,687.87 |
| 10740 Gessner Rd 77064 (Acct. #120-591-001-0056) | $30,991.50 |
| **Total** | **$1,069,296.52** |

---

[2] Although the tax statement is in the name of Sandtrap II, Ltd., the interest was assigned to REIT as part of the 2014 Mortgage Loan between JPMorgan Chase and REIT which is more fully described in the Debtors' Motion for Use of Cash Collateral.

As part of the Secured Loan, the Secured Noteholder maintained a Property Tax Escrow Account for the Taxes which, according to Midland's December statement, held $1,099,802.24. On or about January 31, 2019, the Taxes were paid by the Secured Noteholder in satisfaction of the Taxing Authorities secured claims.

(c)      <strong>Secured M&M Liens</strong>

L REIT also scheduled secured claims filed by various trade vendors who performed work on one or more of the Real Properties and who, under Texas state law, filed statutory mechanics and materialmen's liens for amounts each assert were unpaid.  The known creditors who filed mechanics and materialmen's liens (the "**Secured M&M Lien Claimants**") are summarized as follows:

| Creditor | Scheduled Secured Claim | Claim is | Amount of Filed Claim/Lien |
|---|---|---|---|
| Glass & Mirror, Ltd. | $0.00 | Scheduled as an unsecured claim in the amount of $15,110.62.  On February 6, 2019, Glass & Mirror filed a Notice of Perfection of Constitutional Lien with the Bankruptcy Court.  [Docket No. 72] | $17,021.24 |
| Kilgore Industries, LP | $1,685.47 | Not disputed | 1,687.47 |
| Kilgore Industries, LP | $0.00 | Disputed.  L REIT asserts it has paid $13,776.13 in satisfaction of Kilgore's claim. | $13,776.13[3] |
| OSG Services, Inc. | $20,371.03 | Disputed. | |
| Quality Airflow | $14,462.50 | Disputed.  L REIT asserts a claim against Quality Airflow for nonperformance which offsets the amount owed | |
| Restoration Management 2013 Inc. | $1,948.50 | Disputed. | |
| | $38,467.50 | | $32,484.842 |

---

[3] The proof of claim filed by Kilgore lists the amount owed at $16,461.60, however the documentation attached to the proof of claim only identifies amounts owed of $15,461.60.

### (d)    Disputed Secured Claim of Bancorp South f/k/a Icon Bank

Over the years, Mr. Nasr took out personal loans from Icon Bank ("**Icon**").  The three (3) outstanding loans owed by Mr. Nasr include:

- Promissory Note #70584661 with current balance of approximately $3,717,473;

- Promissory Note #70530261 with current balance of approximately $6,423,028;

- Promissory Note #7065562 with current balance of approximately $1,695,196

(collectively the **"Icon Loans"**).  The Debtors estimates that the outstanding balance owed with respect to the Icon Loans at $11 million though they have been unable to confirm what amount is owed. Icon Bank recently merged with Bancorp South which may now be the Holder of the Icon Loans.

On February 2018, L REIT executed a deed of trust in favor of Icon Bank for the outstanding amount owed on the Icon Loans whereby the Icon was granted a second lien security interest in the Real Properties.  The Debtors dispute the validity of Icon's security interest in the Real Properties because it was not supported by consideration.  The Debtors believe the interests are voidable fraudulent transfers and will act during the pendency of this case or after confirmation to deem such interests void or obtain a settlement which provides for release of the lien.  The Debtors assert Icon's claim is an obligation of Mr. Nasr individually and *not* owed by the Debtors or secured by the Real Properties.  Debtors do not intend to pay Icon as part of its Plan.  Instead, Mr. Nasr will have to negotiate a resolution with Icon directly.

### (e)    Disputed Secured Claim of Financial Agent Services

On November 8, 2018, Financial Agent Services, filed a UCC-1 Financing Statement against L REIT's accounts, chattel paper, general intangibles, and instruments. Financial Agent Services represented that it had purchased future receivables and/or sale proceeds from L REIT. L REIT has disputed the claim and will seek to avoid it.

### (f)    Unreleased Secured Claims

Finally, L REIT has scheduled the claims of First Community Credit Union and Tax Ease Funding, LP as secured claims against some of the Real Properties.  L REIT asserts these amounts were paid in full, but that the liens were not released.  Each claim is listed as contingent, unliquidated and disputed.  Debtors do not intend to pay such claims as part of its Plan.

### (g)    Unsecured Liabilities Scheduled by L REIT

L REIT has also scheduled general unsecured claims of third parties in the aggregate amount of $342,525.93.  L REIT has also scheduled claims of affiliates and insiders of the Debtors in the aggregate amount of $3,650,539.91.

D.      **Beltway's Financial Situation as of Petition Date**

1.      **Beltway's Pre-Petition Assets**

The only asset of value scheduled by Beltway is its 99% limited partnership interest in L REIT.

2.      **Beltway's Pre-Petition Liabilities**

(a)      **Mezzanine Lender**

The Mezzanine Lender, Annaly Capital Management, Inc., holds a secured interest in Beltway's limited partner interest in L REIT.  Under the terms of the Mezzanine Loan, Annaly is able to exercise all rights in the pledged interests of L REIT five (5) days after a notice of default is provided and not cured.  As of the Petition Date, $7 million was owed on the Mezzanine Loan.

The Mezzanine Lender has filed Proof of Claim No. 7 in the aggregate amount of $10,538,836.54.   In its claim, the Mezzanine Lender claims a prepayment penalty of $2,915,561.54.  The Debtors dispute that the prepayment penalty is owed.

(b)      **Unsecured Liabilities Scheduled by Beltway**

As of the Petition Date, Beltway's scheduled general unsecured liabilities of trade creditors totaled $0.00.  The Debtors do not believe any unsecured liabilities exist.

E.      **Operations During Bankruptcy**

L REIT has operated its business as Debtor-in-Possession since the Petition Date and has not made any extraordinary disposition or acquisition of assets since that date.

F.      **Significant Events in this Chapter 11 Case**

1.      **Cash Collateral Use**

- *Motion (I) For Order Granting Authority To Use Cash Under 11 U.S.C. §363 And §105 And (II) Request For A Final Hearing [Docket No. 27].*  On December 24, 2018, the Debtors filed a motion requesting authority to use rents collected to pay for ongoing operations and debt service obligations.  The Secured Noteholder objected to the motion and the proposed budget and requested adequate assurance payments as additional protection.  The Mezzanine Lender filed a limited objection in which it requested that certain disclosures be made to it by both the Debtors and the Secured Noteholder.  After negotiations with the Lenders the Debtors submitted a stipulation and revised budget to the Bankruptcy Court.  The revised budget provided for the use of cash through March 31, 2019.  On January 8, 2019, the Bankruptcy Court held a hearing on the cash collateral motion during which it approved the use of cash collateral consistent with stipulation and revised budget.

An order granting the cash collateral motion was entered on the same day [Docket No. 44]. As of this date, cash collateral use has been extended through April 30, 2019 by stipulation with the Secured Noteholder

**2.      Bidding Procedures**

- *Motion for Order (A) Approving Sale and Bidding Procedures In Connection With Sale of Assets; (B) Approving The Form and Manner of The Notice of (i) Sale Hearing And (ii) Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases and Proposed Cure Costs Relating Thereto and (C) Scheduling A Sale Hearing [Docket No. 86].* On March 27, 2019, Debtors filed a motion to approve bidding procedures for sale of the Real Properties. The bidding procedures contemplate a marketing period through June 14, 2019 with final offers coming later than month and a hearing to approve the winning bidder in July (the "**Bidding Procedures**"). The sale is expected to close 60–90 days thereafter.

**3.      Employment Applications**

- *Application to Employ Hoover Slovacek as Attorney for Debtors [Docket No. 29]* On January 1, 2019, the Debtors filed an application to employ Hoover Slovacek, LLP ("**HSLLP**") as their bankruptcy counsel. An order approving HSLLP's retention was entered on January 20, 2019 [Docket No. 57].

- *Application to Employ Marcus & Millichap As Real Estate Broker For Debtors [Docket No. 35].* On January 4, 2019, the Debtors filed an application to employ Marcus Millichap ("**M&M**") as the real estate broker to market and sell the Real Properties. The Lenders objected to M&M's retention by the estate. The Bankruptcy Court entered an order authorizing the employment of M&M on January 20, 2019 [Docket No. 58] which was later vacated [Docket No. 66]. Ultimately the Debtors, in consultation with the Lenders, chose another broker to market and sell the Real Properties.

- *Emergency Application to Employ Avison Young as Real Estate Broker for Debtors [Docket No. 70].* After consultation with the Lenders and several additional brokers, the Debtors choose Avison Young ("**Avison**") as its broker. In addition to experience, Avison agreed to a lower commission and special terms which made their employment advantageous to the estate. On February 4, 2019, the Debtors filed an emergency motion to employ Avison as its real estate broker. Despite recommending the broker, the Lenders took issue with certain provisions of the listing agreement. After further negotiations, the Debtors and Lenders submitted an agreed order and revised listing agreement to the Bankruptcy Court. On February 9, 2019, the Bankruptcy Court entered an order authorizing the employment of Avison [Docket No. 77].

- *Debtors' Supplemental Application to Employ Avison Young As Leasing Agent [Docket No. 81].* On February 27, 2019 the Debtors filed a supplemental application to extend Avison's employment to include leasing services. On April ___, 2019 the Bankruptcy Court entered an order authorizing Avison to provide those services to the Debtors [Docket No. __].

### 4.     Other Pleadings

- *Notice of Designation as Complex Chapter 11 Bankruptcy Case [Docket No. 3].* The Debtors designated this case as a complex Chapter 11 bankruptcy based on the total amount to debt at issue. On December 13, 2018, the Bankruptcy Court entered an order granting the Debtors treatment as a complex Chapter 11 bankruptcy case [Docket No. 16].

- *Emergency Motion of L REIT Ltd., et al. for Entry of an Order Directing Joint Administration of Chapter 11 Cases [Docket No. 2].* To save duplication of costs, the Debtors also requested that the Bankruptcy Court enter an order which allowed for the joint administration of L REIT's and Beltway's Chapter 11 Cases. An order authorizing joint administration was entered on December 6, 2018 [Docket No. 9].

**ARTICLE III**
**CLASSIFICATION OF CLAIMS UNDER THE PLAN**

Total distributions will not exceed the amount of any Allowed Claim, with interest.

### A.     Administrative Expenses

In accordance with Section 1123(a)(l) of the Bankruptcy Code, certain Administrative Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III. These unclassified Claims are treated as follows.

### 1.     Administrative Claims Bar Date

Except for administrative expenses incurred in the ordinary course of operating L REIT's business, or administrative claims allowed by prior order of the Bankruptcy Court, any Holder of an Administrative Claim (including any cure Claims for Executory Contracts or leases that are assumed pursuant to this Plan) against the Debtors will file an application for payment of such Administrative Claim on or within sixty (60) days of the Effective Date with actual service upon counsel for the Debtors (the "**Administrative Claims Bar Date**"). If such application is not filed by such date, the Holders of such Administrative Claims will be forever barred and extinguished, and such Holder will, with respect to any such Administrative Claim, be entitled to no distribution and no further notices

### 2.      Payment of Administrative Claims

Each Holder of an unpaid Allowed Administrative Claim will be paid in Cash, in full, from cash on hand if available or the Net Sale Proceeds on the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless the Holder of such Claim agrees to a different treatment.  The Debtors reserve all rights to surcharge the Collateral of any secured creditor, including but not limited to the Secured Noteholder, under 11 U.S.C. § 506.  Payment of United States Trustee Fees Incurred Prior to Confirmation.

After confirmation, the Disbursing Agent will file with the Bankruptcy Court and transmit to the U.S. Trustee a statement of all disbursements made by the Debtors for each month or portion thereof, that this Chapter 11 case remains open in a format prescribed by the U.S. Trustee.  The Disbursing Agent will timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree closing this Chapter 11 case or enters an order either converting this case to a case under Chapter 7 or dismisses the case.

## B.      Classification of Secured and Unsecured Claims

All Claims and Interests, except for Administrative Claims, are placed in the Classes as set forth below.

A Claim or Interest is placed in a particular Class only to the extent the Claim or Interest falls within the description of that Class and classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class only for the purpose of voting on, and receiving distributions pursuant to, the Plan to the extent such Claim or Interest is an Allowed Claim, or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

Under the Plan, Claims and Interests are classified as follows:

| Class | Description | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 1 | Allowed Secured Claim of the Secured Noteholder against L REIT | Unimpaired | Presumed to Accept |
| 2 | Allowed Secured M&M Claims | Impaired | Presumed to Accept |
| 3 | Allowed Claims of L REIT's General Unsecured Creditors | Impaired | Accept or Reject |
| 4 | Allowed Secured Claim of the Mezzanine Lender against Beltway | Unimpaired | Presumed to Accept |
| 5 | Allowed Claims of Beltway's General Unsecured Creditors | Impaired | Accept or Reject |
| 6 | Allowed Claims of Affiliates and Insiders | Impaired | Accept or Reject |
| 7 | Equity Interests in L REIT | Impaired | Not Entitled to Vote |

| Class | Description | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 8 | Equity Interests in Beltway 7 | Impaired | Not Entitled to Vote |

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, prior to the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy.  Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes the amount of any contingent or unliquidated Claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the Chapter 11 Cases. In addition, the Bankruptcy Court may in accordance with Section 506(b) of the Bankruptcy Code conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

### C.        Treatment of Claims and Interests Under Plan

Certain Claims, Administrative Claims, are not classified under the Plan, and are not entitled to vote on the Plan.  The treatment of these Claims is set forth in Article III.A., *supra*.

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan.

| Class | Type of Claim or Equity Interest (*Impairment*) | Approx. Amount of Claims and Interests | Summary of Treatment of Claims or Interests | Percentage Recovery Under Plan |
|-------|-------------------------------------------------|----------------------------------------|---------------------------------------------|--------------------------------|
| 1 | L REIT Secured (*Unimpaired*) | $50,608,757.79[4] | Assumption or Payment in Full from the Sale Proceeds | 100% |
| 2 | L REIT Secured (*Impaired*) | $70,264.87[5] | Payment in Full from Sale Proceeds Without Interest | 100% |
| 3 | L REIT General Unsecured (*Impaired*) | $367,920.68 | Payment in Full from Net Sale Proceeds Without Interest | 100% |
| 4 | Beltway 7 Secured (*Unimpaired*) | $7,284,802.79.[6] | Assumption or Payment in Full from Net Sale Proceeds With Interest | 100% |

---

[4] Represents principal amount plus non-default interest allegedly owed per the Secured Noteholder's proof of claim.  Additional interest, fees and costs will be due to the Secured Noteholder.  The Debtors dispute that the Default Interest, Prepayment Premium and Special Servicing Fees amounts are owed.

[5] As previously discussed, the total amount due to Class 2 Claimants are disputed.

[6] Represents principal amount plus non-default interest allegedly owed per the Mezzanine Lender's proof of claim.  Additional interest, fees and costs will be due to the Mezzanine Lender.  The Debtors dispute that the prepayment penalty is owed.

| Class | Type of Claim or Equity Interest (*Impairment*) | Approx. Amount of Claims and Interests | Summary of Treatment of Claims or Interests | Percentage Recovery Under Plan |
|---|---|---|---|---|
| 5 | Beltway 7 General Unsecured (*Impaired*) | $0.00 | If any, Payment in Full from Net Sale Proceeds, Without Interest | 100% |
| 6 | L REIT Insider (*Impaired*) | $3,650,539.91 | To the Extent Proceeds Are Sufficient, Payment in Full from Net Sale Proceeds With Interest.  If Proceeds Are Insufficient, Then Pro Rata Without Interest. | 100% |
| 7 | Equity Interests in L REIT (*Impaired*) | 100% | To the Extent Proceeds Are Sufficient To Pay All Creditors In Classes 1–6 In Full, Any Surplus  will be Paid to the Holders of Interests in L REIT. | Unknown |
| 8 | Equity Interests in Beltway 7 (*Impaired*) | 100% | To the extent proceeds are paid to Beltway on behalf of its interest in L REIT, such proceeds shall be transferred to Holders of Interests in Beltway. | Unknown |

**Except as provided otherwise in the Plan or by order of the Bankruptcy Court, only holders of Claims or Interests who hold those Claims or Interests as of the Record Date will be entitled to the treatment described above**. The Record Date for Allowed Claims is the date the order approving the Disclosure Statement was entered by the Bankruptcy Court. The Record Date for Equity Interests is the Petition Date.

### D.   Other Claims Matters

#### 1.   Satisfaction of Claims and Interests.

Holders of Claims and Interests will receive the distributions detailed in the Plan, if any, in full settlement and satisfaction of all such Claims, and any interest accrued thereon, and all such Interests.

#### 2.   Assumption and Rejection of Executory Contracts.

The Debtors will reject all Executory Contracts except for those previously assumed by Bankruptcy Court Order or those listed on **Exhibit A** to the Plan.  Any Claims arising from rejection of an executory contract or lease must be filed on or before twenty (20) days from the

Closing Date.  Otherwise, such Claims are forever barred and will not be entitled to share in any distribution under the Plan.  Any Allowed Claims arising from rejection of Executory Contracts, if timely filed and allowed, will be paid as a Class 3 General Unsecured Claim.

### 3.      Objections to Claims.

The Debtors or the Disbursing Agent will, prior to, on and after the Effective Date, have the right to make and file objections to Claims, including Administrative Expenses.  Unless otherwise ordered by the Bankruptcy Court, all objections to Claims that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court will be filed and served upon the Holder of such Claim no later than one hundred twenty (120) days after the Effective Date.

### 4.      Prosecution of Objections.

On and after the Effective Date, except as the Bankruptcy Court may otherwise order, the filing, litigation, settlement or withdrawal of all objections to Claim and Reserved Avoidance Actions may be made by the Debtors and/or Disbursing Agent.

### 5.      Disallowance of Claims.

All Claims held by Persons against whom the Debtors or its Estate have asserted a Claim or Cause of Action under Sections 522(f), 522(h), 542, 543, 544, 547, 548, 549, 550, 551, 553, or 724(a) of the Bankruptcy Code, including, without limitation, the Chapter 5 Actions and the Derivative Claims, will be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and holders of such Claims may not vote to accept or reject the Plan until such time as such Claims or Causes of Action against the Person have been settled or a Final Order entered and all sums due the Debtors by that Person are turned over to the Debtors.

### 6.      Disputed Claims.

Except as otherwise provided in the Plan, no payments will be made with respect to all or any portion of a Disputed claim unless and until any and all objections to such Disputed Claim have been determined by a Final Order.  Payments and distributions to each holder of a Disputed Claim, to the extent that the Disputed Claim ultimately becomes an Allowed Claim, will be made in accordance with the provisions of the Plan.  Any payments that would have been made prior to the date on which a Disputed Claim becomes an Allowed Claim will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court determining such Claim to be an Allowed Claim becomes a Final Order.

For purposes of the Plan, any and all Claims that are subject to disallowance pursuant to Bankruptcy Code Sections 502(e) and 509 will be deemed to be disallowed as of the Confirmation Date, notwithstanding the absence of any objection thereto.

# ARTICLE IV
# MEANS OF EXECUTION OF PLAN

### A.      Sources of Consideration for Plan Distributions

The Plan provides for the sale of the Real Properties in connection with the Sale Motion which will allow Qualified Bidders to submit Qualified Bids in connection with Bankruptcy Court approved Bidding Procedures.  The Successful Bid will be submitted to the Bankruptcy Court for approval and entry of the Sale Order.   The Sale Order may be entered after  the Effective Date. The proceeds of the sale will be distributed pursuant to the terms of the Plan.  Mr. Moe Nasr and/or a group formed by him shall be allowed to bid.  L REIT and Beltway 7 also reserve the right to cure all defaults with respect to the notes held by the Secured Noteholder and Annaly, provided all other creditors with Allowed Claims are paid in full.

### B.      Release of Liens.

Unless the Liens of the Secured Noteholder and/or Annaly or assumed, at the Closing Date of the sale of the Real Properties, all holders of Liens on any of the Real Properties will be deemed to have released their respective Liens upon the respective Real Properties as provided in this Plan. Holders of Liens against the Real Properties must execute any instrument(s) reasonably requested to confirm and effectuate such deemed release.  Liens will attach to the Net Sale Proceeds in the same priority as they previously attached to the respective Real Properties *except that* the lien of Icon *will not* attach to the Net Sale Proceeds or any other assets of the Debtors' estates.

### C.      Sale Free and Clear.

Unless the Liens of the Secured Noteholder and/or Annaly or assumed, upon Closing, all right, title and interest of the Debtors and their respective Estates in and to the Real Properties will vest in the purchaser free and clear of all Claims, Liens, encumbrances, interests, restrictions, easements, leases, tenancies, agreements of sale and other title objections.

### D.      Distribution of Net Sale Proceeds.

Net Sale Proceeds will be distributed in accordance with the terms of Articles 3, 4 and 6 of the Plan.

### E.      Distribution of Other Assets and Net Litigation Proceeds.

The Other Assets and/or Net Litigation Proceeds, if any, for each Debtor will be distributed periodically by the Disbursing Agent, in intervals and amount to be determined in its sole discretion.

**F.      Funding of Plan.**

The source of funds to achieve consummation of and carry out the Plan will be (i) the Net Sale Proceeds; (ii) the Other Assets, if any; and (iii) the Net Litigation Proceeds, if any, which will be used to satisfy Claims in the manner and order of priority in Articles 3, 4 and 6 in the Plan.

**G.      Disbursing Agent.**

The Debtors and/or their agents will act as the Disbursing Agent.  If the Debtors and/or their agents choose not to act as the Disbursing Agent, then they will designate a substitute.

**H.      Vesting of Property of the Estate in the Debtors.**

Except as otherwise expressly provided in the Plan or the Confirmation Order, pursuant to Section 1141(b) of the Bankruptcy Code, upon the Effective Date, all property of the Bankruptcy Estate will vest in the Debtors free and clear of all Claims, liens, encumbrances, charges or other Interests of Creditors and Interest Holders.

**I.      Preservation of Claims and Causes of Action**

**1.      Avoidance Actions**

Under Section 547 of the Bankruptcy Code, a debtor's bankruptcy estate may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one (1) year preference period.

There are certain defenses to preference recoveries. Transfers made in the ordinary course of the debtor's and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable. Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property. If a transfer is recovered by the estate, the transferee has an Unsecured Claim against the debtor to the extent of the recovery.

On January 22, 2019, the Debtors filed the Amended Statement of Financial Affairs (Doc Nos. 55, 56) which include, among other information, a list of potentially preferential transfers made within the preference period.  Copies of each Debtors' Statement of Financial Affairs and any amendments thereto filed in this bankruptcy case may be viewed online any time through the Bankruptcy Court's PACER System at www.txs.uscourts.gov.  The Debtors have not yet analyzed whether any of these payments are preferences (within the meaning of the Bankruptcy Code) or whether the recipients of such payments would have a defense to a preference action, if commenced.  Creditors should be aware that payments received within the preference period may

be subject to avoidance and recovery in a subsequent action by any Chapter 7 Trustee that may be appointed in this case if the Plan is not confirmed.  **Upon the Effective Date, the Debtors and/or their agents will be vested with the sole authority to review, initiate, and/or pursue any and all preference actions.**

Under Section 548 of the Bankruptcy Code and various state laws, a debtor may avoid as "fraudulent transfers" certain obligations and may recover certain prepetition transfers of property, including the grant of a security interest in property, incurred or made while insolvent to the extent the debtor receives less than fair (or "reasonably equivalent") value for such obligations or property. In addition, avoidance actions exist under Sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property. As of the date of the distribution of this Disclosure Statement, except for the Icon lien described in Article II above, the Debtors have not analyzed whether any transfers made by the Debtors are subject to challenge as constructive fraudulent transfers.  Any

and all such potential claims and causes of action will be preserved and transferred to the Debtors who will pursue this investigation and analysis if appropriate.  **Upon the Effective Date, the Debtors and/or their agents will be vested with the sole authority to review, initiate, and/or pursue any and all avoidance actions under 544, 548, 545, 549 or 553(b) of the Bankruptcy Code**.  Debtors may assign the cause of action against Icon to Annaly.

As of the date of the distribution of this Disclosure Statement, the Debtors have not yet estimated the potential recovery from the prosecution of their Avoidance Actions. Under the Plan, the Avoidance Actions belonging to the Debtors' Estate are specifically reserved and the Debtors will have the exclusive authority as representatives of their respective estates to investigate and prosecute all such Avoidance Actions in accordance with Section 1123(b)(3) of the Bankruptcy Code.

## 2.     Other Claims and Causes of Action

In addition to the Avoidance Actions described above, the Debtors have claims and potential Causes of Action against third parties which, if successful, could generate additional Cash or result in the reduction or elimination of Claims against the Debtors' Estates.

The Debtors may have claims and/or Causes of Action for, without limitation, commercial torts, tortious interference with contractual and/or business relations, unfair competition, breach of contract, loss of income, setoff, recoupment, fraud, fraudulent inducement, misrepresentation, fraudulent or negligent omission, fraudulent or preferential transfers arising other than under the United States Bankruptcy Code, conversion, replevin, lender liability, recharacterization of debt as equity, equitable subordination, challenges as to the extent, priority and validity of any purported claims, liens and/or security interests, injury to property and/or title to property, negligence, recklessness, conspiracy, aiding and abetting, breach of fiduciary duty, breach of confidential relationship, mismanagement, violation of securities laws, self-dealing, usurpation of corporate opportunity, insolvent trading, breach of duty of loyalty, allowing, authorizing and/or

receiving unlawful or improper distributions, unreasonable related party transactions, uncommercial transactions, improper redemption of equity interests, breach of duty of good faith, breach of duty to provide information, breach of duties of care and/or diligence, failure to make informed decisions, improper use of information to gain improper advantage and other, similarly grounded claims and Causes of Action against, without limitation, current and/or former shareholders, members, equity interest holders, debt holders, partners, prospective joint venture participants, joint venture participants, prospective contracting parties, contracting parties, prospective purchasers, purchasers, prospective sellers, sellers, directors, officers, managers, employees, agents, contractors, insurers, sureties, investment bankers, consultants, advisors, representatives, competitors, vendors and/or other creditors of the Debtors and/or entities affiliated with or otherwise related to any of the foregoing. Except as otherwise specifically provided by the Plan, all claims and Causes of Action will be retained under the Plan and transferred to the Debtors to be prosecuted for the benefit of creditors.

Specifically, the Debtors retain their interests in the following lawsuits:

- Cause No. 2018-43063, *L REIT Ltd. v. Bethel Deli LLC d/b/a Victors on the Green and Chauvila Mathew Individually, Guarantor*, in the 334th District Court, Harris County, Texas

- Cause No. 2018-07367, *L REIT, Ltd. vs. Education Management II, LLC fka Education Management LLC aka Education Management Corporation, and The Art Institute of Houston, LLC, Dream Center Educational Holdings, and The Art Institute of Houston, LLC d/b/a Art Institute of Houston*, in the 234th District Court, Harris County, Texas

- Proof of Claim No. 22 filed in Case No. 18-11531, *In re The Art Institute of Houston, Inc.,* pending in the United States Bankruptcy Court for the District of Delaware.

- Proof of Claim No. 74 filed in Case No. 18-11494, *In re Education Management II, LLC* pending in the United States Bankruptcy Court for the District of Delaware.

- Proof of Claim No. 109 filed in the Case No. 18-11502, *In re Education Management, LLC* pending in the United States Bankruptcy Court for the District of Delaware.

## J.      Other Provisions of the Plan

### 1.      Conditions to Confirmation.

Confirmation of the Plan will not occur, and the Bankruptcy Court will not enter the Confirmation Order unless (a) all of the requirements of the Bankruptcy Code for confirmation of the Plan with respect to the Debtors have been satisfied (b) the Bidding Procedures have been approved by the Bankruptcy Court.  In addition, confirmation will not occur, the Plan will be null

and void and of no force and effect, and the Plan will be deemed withdrawn unless the Bankruptcy Court has entered all other orders (which may be orders included within the Confirmation Order) required to implement the Plan.

### 2.      Waiver and Nonfulfillment of Conditions to Confirmation.

Nonfulfillment of any condition to confirmation of the Plan may be waived only by the Debtors.  In the event that the Debtors determines that the conditions to the Plan's confirmation which it may waive cannot be satisfied and should not, in its discretion, be waived, the Debtors may propose a new plan, may modify this Plan as permitted by law, or may request other appropriate relief.

### 3.      Confirmation Order Provisions for Pre-Effective Date Actions.

The Confirmation Order will empower and authorize the Debtors to take or cause to be taken, prior to the Closing Date, all actions which are necessary to enable it to implement the provisions of the Plan and satisfy all other conditions precedent to the effectiveness of the Plan.

### 4.      Conditions to the Effective Date.

The following are conditions precedent to the effectiveness of the Plan: (i) the Plan is confirmed and the Confirmation Order has become a Final Order; (ii) Debtors do not withdraw the Plan at any time prior to the Effective Date; and (iii) the Sale of the Real Properties closes.

### 5.      Binding Effect.

As provided for in Section 1141(d) of the Bankruptcy Code, the provisions of the Plan bind the Debtors, any entity acquiring property under the Plan and any Creditor, Interest Holder, or shareholder of the Debtors, whether or not the Claim or Interest of such Creditor or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder has accepted the Plan.  After confirmation, the property dealt with by the Plan will be free and clear of all Claims and Interests of Creditors and Interest Holders, except to the extent as provided for in the Plan as the case may be.  The Confirmation Order will contain an appropriate provision to effectuate the terms of paragraph 13.1 of the Plan.

### 6.      Discharge.

Pursuant to Section 1141(d) of the Bankruptcy Code, upon the Effective Date, the Debtors will be discharged from any debt that arose before the date of such confirmation, and any debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of the Claim based on such debt is filed or deemed filed under Section 501 of this title; such Claim is allowed under Section 502 of this title; or the Holder of such Claim has accepted the Plan.

7.        **Injunction.**

The Confirmation Order will include a permanent injunction prohibiting the collection of Claims in any manner other than as provided for in the Plan.  All Holders of Claims will be prohibited from asserting against the Debtors or any of its assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such Holder filed a proof of Claim.  Such prohibition will apply whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or (c) the Holder of a Claim based upon such debt has accepted the Plan.

8.        **Preservation of Setoff Rights.**

In the event that the Debtors have a Claim of any nature whatsoever against the Holders of Claims, the Debtors may, but are not required to setoff against the Claim (and any payments or other distributions to be made in respect of such Claim hereunder), subject to the provisions of Section 553 of the Bankruptcy Code.  Neither the failure to setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors of any Claim that the Debtors have against the Holder of Claims.  Neither this provision nor the injunctive provision of the Confirmation Order will impair the existence of any right of setoff or recoupment that may be held by a Creditor herein; provided that the exercise of such right will not be permitted unless the Creditor provides the Debtors with written notice of the intent to effect such setoff or recoupment. If the Debtors or the Disbursing Agent, as applicable, objects in writing within twenty (20) business days following the receipt of such notice, such exercise will only be allowed upon order of the Bankruptcy Court.  In the absence of timely objection, the Creditor may implement the proposed setoff or recoupment against the Claim held by the Bankruptcy Estate.

9.        **Releases.**

On the Effective Date and pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, the Debtors, and to the maximum extent provided by law, its agents release and forever discharge all claims, including acts taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into or any other act taken or entitled to be taken in connection with the Plan or this case against the following, whether known or unknown:

- Mohammad Nasr, Peter Trevino and John Trevino, their employees, agents, affiliates, attorneys and representatives (the "**Insider Released Parties**"), in connection with any and all claims and causes of action arising on or before the Confirmation Date that may be asserted by or on behalf of the Debtors or the Bankruptcy Estate and/or on account of the Debtors' Bankruptcy Cases will be released.  The release of these Insider Released Parties will be conditioned upon

the occurrence of the Effective Date. Neither the releases contemplated by this Article IV.F.9, nor any provisions of the Plan, will release claims against non-debtor third parties.

- The Debtors' Professionals will be released from any and all claims and liabilities other than gross negligence and willful misconduct or except as otherwise provided under the Professional Code of Responsibility.

### 10. Lawsuits.

On the Effective Date, all lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of Claims against the Debtors except proof of Claims and/or objections thereto pending in the Bankruptcy Court will be dismissed as to the Debtors. Such dismissal will be with prejudice to the assertion of such Claims in any manner other than as prescribed by the Plan. All parties to any such action will be enjoined by the Bankruptcy Court by the Confirmation Order from taking any action to impede the immediate and unconditional dismissal of such actions. All lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a claim(s) by the Debtors or any entity proceeding in the name of or for the benefit of the Debtors against a person will remain in place only with respect to the claim(s) asserted by the Debtors or such other entity, and will become property of the Debtors as may be applicable, to prosecute, settle or dismiss as it sees fit.

### 11. Insurance.

Confirmation and consummation of the Plan will have no effect on insurance policies of the Debtors in which the Debtors or any of the Debtors' representatives or agents is or was the insured party; the Debtors will continue as the insured party under any such policies without the need of further documentation other than the Plan and entry of the Confirmation Order. Each insurance company is prohibited from denying, refusing, altering or delaying coverage on any basis regarding or related to the Debtors' bankruptcy, the Plan or any provision within the Plan.

### K. Directors and Officers of the Debtors.

The Officers of the Debtors are authorized to continue as Officers of the Debtors from and after the Effective Date of the Plan until closing on the sale of the Real Properties.

### L. Claims Bar Dates

### 1. Administrative Claims Bar Date.

Any holder of an Administrative Claim against the Debtors, except for expenses incurred in the ordinary course of operating the Debtors' business, and Claims of governmental units as provided in Section 503(b)(1)(D) of the Bankruptcy Code and will file proof of such Claim or application for payment of such Administrative Claim on or within sixty (60) days after the

Effective Date, with actual service upon counsel for the Debtors or such Holder's Administrative Claim will be forever barred and extinguished and such Holder will, with respect to any such Administrative Claim be entitled to no distribution and no further notices.  To the extent, if any, post-petition taxes are due to the Comptroller on or before the Effective Date, they will be paid in full on the Effective Date in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code.  To the extent, if any, post-petition taxes have been incurred by the Debtors but are not yet due as of the Effective Date, those taxes will be paid when due under and in accordance with state law.

### 2.      Unsecured Claims Bar Date.

The deadline for filing a proof of claim for unsecured claims (other than a claim for damages stemming from the rejection of an executory contract or lease) is **April 22, 2019**.  The deadline for filing governmental proofs of claim was shortened to **June 17, 2019**.

### 3.      Rejection Damage Claim Bar Date.

An Unsecured Claim arising from the rejection of an executory contract or unexpired lease must be filed no later than twenty (20) days after the Closing Date.

### ARTICLE V
### ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.      Confirmation Hearing

The Bankruptcy Court will schedule a hearing to consider Confirmation of the Plan.  At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan should be Confirmed in light of both the affirmative requirements of the Bankruptcy Code and any objections, if any, that are timely filed.

### B.      Requirements of Confirmation

Confirmation of a Plan under Chapter 11 requires, among other things, that at least one class of impaired creditors or claimants, such as the unsecured creditors in this case, vote in favor of the Plan.  This vote is calculated by only counting those creditors who actually send in a ballot on time.  If two-thirds in total dollar amount and a majority in number of claims actually voting in a class approve the Plan, that class of creditors is considered an accepting class.  If the vote is insufficient, the Court can still confirm the Plan, but only upon being provided additional proof regarding the ultimate fairness of the Plan to the creditors.  The Debtors believe that the unsecured creditors will support the Plan when they consider the fact that they will be paid in full over the term of the Plan, but would only receive a fraction of what is owed if the case were to be converted to one under Chapter 7.

The proponent of a Plan also must meet all other applicable requirements of Section 1129(a) of the Bankruptcy code (except Section 1129(a)(8), if the proponent proposes to seek confirmation of a Plan under Section 1129(b) of the Bankruptcy Code).  At the Confirmation

Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of Section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponent, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, will be disclosed to the Bankruptcy Court, and any such payment: (a) made before Confirmation will be reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim or Interest will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

The Debtors believe that the Plan will be able to satisfy each of the 1129(a) confirmation requirements. To determine whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet its obligations under the Plan.

1.      **Best Interest Of Creditors**

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each class, that each holder of a claim or interest of such class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date, that is not less than the amount that such person would receive or retain if the Debtors was, on the effective date, liquidated under Chapter 7 of the Bankruptcy Code.  As set forth below, the Debtors believe that this test will be satisfied.

2.      **Liquidation Analysis**

(a)      **Methodology.**

The starting point in determining the amount which members of each impaired class of unsecured claims and interests would receive in a Chapter 7 case is to estimate the dollar amount that would be generated from the liquidation of the Debtors (the "**Liquidation Proceeds**"). The Liquidation Proceeds of the Debtors would consist of the proceeds from the sale of all of the assets of the Debtors, augmented by the cash held by the Debtors.  The present value of the distribution from the Liquidation Proceeds is then compared with the present value offered to each of the classes of unsecured claims and interests of each such class.

(b)      **Analysis.**

Attached as **Exhibit C** is a liquidation analysis (the "**Liquidation Analysis**").   This Liquidation Analysis indicates that Holders of Claims will receive more through a Chapter 11 liquidation process than what they would be likely to receive if the case were converted to a Chapter 7 liquidation case.  Further, the Chapter 7 payment would be drastically delayed, which is a far less desirable result than the result to be achieved under the Plan.  Under the Plan, all Allowed Class 3 Claims will be paid in full within thirty (30) days of the Effective Date except as otherwise agreed to or provided by this Plan.  However, as discussed below, in liquidation, these creditors would likely not receive any distribution until the assets were fully liquidated by the Chapter 7 Trustee. This process would likely take several months and possibly years before any payment would be made to creditors.

As previously discussed, the Debtors primary assets are the Real Properties.  The Debtors in consultation with its broker, Avison, estimated the liquidation value of the Real Properties at pre-petition NOI at $66,689,520.   The Debtors also anticipate holding cash of approximately $100,000 if the case is converted plus any funds contained in the reserve accounts that are reimburse to the Debtors.  The value of the Other Assets and Net Litigation Proceeds are unknown, but have little value compared to the Real Properties.

As disclosed above, the Real Properties are secured by the Secured Noteholder's Class 1 Secured Claim.  The Secured Noteholder has filed a Claim in the amount of $56,595,034.50.  In a Chapter 7 liquidation, the amount currently owed to the Secured Noteholder will increase as

additional interests, fees and costs, including attorney's fees accrue, and would need to be paid before any distribution could be made to the Chapter 7 estate. Further, in a liquidation, the Chapter 7 Trustee would utilize any cash generated from the sale of the Debtors' assets first to pay ongoing expenses associated with the Chapter 7 case, including payments to various professionals such as attorneys, brokers, auctioneers and accountants. These fees would be paid ahead of the prepetition claims in this case.

As set forth in **Exhibit C**, absent confirmation of the Plan, the Chapter 11 Case would be converted to a case under Chapter 7 of the Bankruptcy Code and the assets would be liquidated for at best $66,689,520. As stated above, Chapter 7 administrative fees and expenses, then Chapter 11 administrative expense claims would be paid ahead of all other claims.

Further, the conversion of the Case to a case under Chapter 7 would add another layer of administrative expense, including professional fees and trustee commissions that would further impair the timing and potential recovery of Allowed General Unsecured Claims. Thus, the proposed distribution to Allowed Class 3 Claims under the Plan is far more than what could be expected to be received in a Chapter 7 liquidation.

### C.      Confirmation without Acceptance of All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all impaired classes, provided that at least one impaired class of claims has accepted it (determined without including any acceptance by any insider holding a claim of such class). These "cram-down" provisions, for confirmation of a Plan despite the non-acceptance of one or more impaired classes of claims or interests, are set forth in Section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination.

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.      Fair and Equitable Test

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides: (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain, on account of its claim, property that has a value as of the Effective Date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interest of such class will not receive or retain, on account of such junior

claim or interest, any property unless the senior class is paid in full.  The Bankruptcy Court must further find that the economic terms of a plan do not unfairly discriminate as provided in Section 1129(b) of the Bankruptcy Code with respect to the particular objecting class.  Under the terms of this plan, the principals of the Debtors will retain their interest in the Debtors.  The retention of this interest may prevent the Debtors from seeking relief under 1129(b)(2)(B).  However, if the plan is not confirmed, unsecured creditors will likely not receive any distribution in a liquidation.

### 3.      Absolute Priority Rule

Section 1129(b)(2)(B)(ii) controls the payment of senior and junior classes of claims or interests in the event that all of the applicable requirements of Section 1129(a), other than paragraph (8), are met with respect to a plan.  In the event that any impaired class (other than an "insider", as defined in 11 U.S.C. § 101(31)) rejects the Plan, the equity interest holders (or other interests junior to unsecured creditors) may only retain their interest in the Debtors in return for new value infused into the Debtors in accordance with *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 445 (1999). The assessment of the required "new value" for the equity interest holders (or other interests junior to unsecured creditors) is to be made in the event that any impaired class (that is not an "insider") rejects the Plan.

The Debtors believe that the Plan meets the "fair and equitable" test and does not discriminate unfairly with respect to all classes of creditors or interest holders.  Under the terms of this plan, the principals of the Debtors will retain their interest in the Debtors.  The retention of this interest may prevent the Debtors from seeking relief under 1129(b)(2)(B). Unless all impaired classes vote for the Debtors' plan, the retention of this interest will prevent the Debtors' plan from being confirmed and this case will be converted to chapter 7.

### ARTICLE VI
### VOTING PROCEDURES

### A.      Ballots and Voting Deadline

Accompanying this Disclosure Statement is a "Notice of: (A) Deadline to Vote to Accept or Reject the First Amended Joint Chapter 11 Plan of Reorganization for the Debtors and Debtors-in-Possession, (B) Deadline to Object to Approval of the First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization for the Debtors and Debtors-in-Possession, (C) Deadline to Object to Plan Confirmation, (D) Combined Hearing to Consider Final Approval of Disclosure Statement and Confirmation of Plan, and (E) Related Matters and Procedures" (the "**Solicitation Notice**").

**In order for your vote to count, you must follow the directions set forth in the Solicitation Notice accompanying the Disclosure Statement and Plan which contains a detailed description of the process for voting and the tabulation of ballots.**

A ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement and has been mailed to holders of Claims and Interests entitled to vote. After carefully reviewing

the Disclosure Statement and all exhibits, including the Plan, each holder of a Claim or Interest entitled to vote should indicate its vote on the enclosed ballot. All holders of Claims or Interests entitled to vote must (i) carefully review the ballot and instructions thereon, (ii) execute the ballot, and (iii) return it to the address indicated on the ballot by the Voting Deadline (defined below) for the **ballot to be considered.**

In order for your vote on the Plan to count, the original, signed Ballot *must be actually received* by counsel for the Debtors **no later than _____, 2019 at 5:00 p.m. United States Central Time** ("**Voting Deadline**"). Any Ballot received by the Balloting Agent after the Voting Deadline will not be counted, unless the Bankruptcy Court orders otherwise. Ballots will not be counted if they are delivered by facsimile, email or any other electronic means or that do not contain an original signature.

After completion of the ballot, creditors should return the executed ballot in the self-addressed envelope to:

**L REIT, LTD./BELTWAY 7 PROPERTIES LTD.**
**C/O EDWARD L. ROTHBERG/MELISSA A. HASELDEN**
**HOOVER SLOVACEK LLP**
**5051 WESTHEIMER, SUITE 1200**
**HOUSTON, TX 77056**

### B.     Holders of Claims Entitled to Vote

Except as otherwise provided in the Plan, any holder of a Claim against the Debtors whose claim is impaired under the Plan is entitled to vote, if either (i) the Debtors have scheduled the holder's Claim at a specific amount other than $0.00 (and such Claim is not scheduled as "disputed," "contingent," or "unliquidated") or (ii) the holder of such Claim has filed a Proof of Claim on or before the deadline set by the Bankruptcy Court for such filings in a liquidated amount. Any holder of a Claim as to which an objection has been filed (and such objection is still pending as of the time of confirmation of the Plan) is not entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Bankruptcy Court before the first date set by the Bankruptcy Court for the Confirmation Hearing of the Plan. In addition, the vote of a holder of a Claim may be disregarded if the Bankruptcy Court determines that the holder's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

### C.     Bar Date for Filing Proofs of Claim

The Bankruptcy Court established a bar date for filing proofs of claim or interests in this case of **April 22, 2019**. The Bankruptcy Court further established a bar date for filing proofs of claim by Governmental Units of **June 17, 2019**. Timeliness or other substantive issues which may

affect the ultimate allowability of a particular claim have not been considered in connection with classification. As described in Section 7.3 of the Plan, the Debtors must bile objections to Claims by no later than one hundred twenty (120) after the Effective Date, unless this deadline is extended by the Bankruptcy Court upon motion of the Debtors.

### D.    Definition of Impairment

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan, unless, with respect to each claim or interest of such class, the plan:

1.    Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

2.    Notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

    a.    Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

    b.    Reinstates the maturity of such claim or interest as it existed before the default;

    c.    Compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

    d.    Does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or interest; or

3.    Provides that, on the Effective Date the holder of such claim or interest receives, on account of such claim or interest, cash, equal to:

    a.    With respect to a claim, the allowed amount of such claim; or

    b.    With respect to an interest, if applicable, the greater of:

        i.    Any applicable fixed liquidation preference; or

        ii.    Any fixed preference at which the Debtors, under the terms of the security, may redeem the security.

4.    In Article V of the Plan, the Debtors have identified the impaired classes of creditors under the Plan.  In the event there are questions regarding whether a person is in an impaired class, the person should assume that his or her claim is impaired and vote.  If the claim is determined to be impaired, the vote will be considered by the Bankruptcy Court.  Holders of Class 3, Class 4 and Class 5 claims and Class 6 interest holders are impaired under the Plan.

**IMPAIRED CREDITORS ANTICIPATED TO RECEIVE A DISTRIBUTION UNDER THE PLAN ARE BEING SOLICITED TO VOTE.  IF YOU HOLD AN ADMINISTRATIVE CLAIM OR UNIMPAIRED CLAIM, THE DEBTOR IS NOT SEEKING YOUR VOTE.**

E.      **Classes Impaired Under the Plan**

Holders of Class 1, Class 2 and Class 3 Claims are not impaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, holders of Claims within these Classes are conclusively presumed to have accepted the Plan, and therefore are not entitled to vote to accept or reject the Plan.

Allowed Class 4 Claims are impaired under the Plan but, as insiders and affiliates, are entitled to vote to accept or reject the Plan.

Holders of Class 5 Interests are impaired under the Plan and will retain their interests in the Debtors to the same extent as held before the Petition Date.  Accordingly they are conclusively presumed to have rejected the Plan under Bankruptcy Code Section 1126(g), and therefore, are not entitled to vote to accept or reject the Plan.

F.      **Information on Voting and Ballots**

Ballots are being forwarded to all holders of Claims entitled to vote. The Bankruptcy Court has approved the procedures for solicitation of votes on the Plan and the tabulation of the ballots received from holders of Claims and Interests that are contained in the Solicitation Notice included in the solicitation package. **The descriptions of the solicitation and tabulation procedures contained in the Solicitation Notice are incorporated by reference as if fully set forth herein**.

**ARTICLE VII**
**ALTERNATIVES**

Although the Disclosure Statement is intended to provide information to assist creditors in making a judgment on whether to vote for or against the Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful.  These alternatives include conversion to a Chapter 7 or dismissal of the proceedings.  The Debtors of course, believes the proposed Plan to be in the best interests of creditors.   the Debtors assesses the alternatives as follows:

A.      **Conversion to Chapter 7**

The first alternative would be to convert the Chapter 11 case to a Chapter 7 liquidating bankruptcy to liquidate the business.  If this occurred, the Bankruptcy Court will appoint a trustee to liquidate the Debtors' assets for the benefit of its creditors.  The costs associated with a trustee would then be added to the additional tier of administrative expenses entitled to priority over general unsecured claims upon conversion.  Such administrative expenses include the Trustee's commissions, as well as fees for professionals retained by the Trustee to assist in the liquidation.

The Trustee's commissions are based on disbursements to creditors.  The Trustee receives 25% of the first $5,000, 10% of the next $45,000, 5% of the next $950,000 and 3% on all amount disbursed in excess of $1 million.

**B.     Dismissal**

Dismissal of the proceeding would likely result in the Debtors and the plan proponents defending debt-collection litigation and numerous new lawsuits to collect debts.  The Secured Noteholder would foreclose on Real Properties likely halting operations.  Under this scenario, the unsecured creditors would likely receive no payment whatsoever on their claims.

**C.     No Assurance of Either**

There are other possibilities which are less likely, such as a competing plan proposed by a different party.  The Debtors have attempted to set forth the reasonable alternatives to the proposed Plan. However, the Debtors must caution creditors that a vote must be for or against the Plan.  The vote on the Plan does not include a vote on alternatives to the Plan.  There is no assurance what course the proceedings will take if the Plan fails acceptance.

**D.     Preferences and Fraudulent Transfers**

Under the Bankruptcy Code and Texas State Law, the bankruptcy estate may sue to recover assets (or their value) that were transferred by "voidable transfers", which includes assets transferred:

(A)     in fraud of Creditors,

(B)     in constructive fraud of Creditors – because the asset was transferred without sufficient consideration while the Debtors was insolvent,

(C)     as a preferential transfer - a payment before bankruptcy outside the ordinary course that allows a creditor to receive more than it would receive in liquidation, or

(D)     as an unauthorized post-bankruptcy transfer by the Debtors outside of the ordinary course.

A list of all transfers made during the applicable avoidance periods is attached to the Debtors Statement of Financial Affairs filed with the Bankruptcy Court on April 11, 2018 (Doc. No. 8).  the Debtors does not believe that any of these transfers are voidable under Sections 550, 547, 548, 544, or similar provision of the Bankruptcy Code.

If the Plan is not confirmed and a liquidating trustee or Chapter 7 trustee is appointed, it is possible that the trustee's analysis will differ from that of the Debtors and that avoidance actions will be commenced against Creditors of the estate, insiders, or others.

# ARTICLE VIII
# RISKS POSED TO CREDITORS

The principal risk to the creditors is that the Plan will not be confirmed.  Absent confirmation of the Plan, the case would likely be converted to a Chapter 7 to liquidate the Debtors' assets.  As stated herein and in the Liquidation Analysis attached as **Exhibit C**, the Debtors does not believe conversion would result in a significant distribution to its creditors.  Accordingly, conversion to Chapter 7 is a risk.

# ARTICLE IX
# CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**A.     Tax Consequences to Creditors**

**1.     Generally**

The tax consequence to any particular creditor may vary depending on their own circumstances and they should consult with their own tax professional for advice regarding the impact on them of their acceptance or rejection of the Plan.

**2.     Unsecured Claims**

Under the Debtors' proposed Plan, Holders of Unsecured Claims will receive distributions from the Debtors.  These Claimholders should either be treated as (i) recognizing ordinary income in an amount equal to cash received and recognizing a loss in an amount equal to the tax basis in the Claim or (ii) recognizing a loss equal to the difference between the amount of cash received and their tax basis in their Claim.

A Claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the Debtors, except to the extent that a bad debt loss had previously been claimed. The gain or loss with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtors.

**DUE TO THE COMPLEX NATURE OF APPLICABLE TAX LAWS, CLAIMANTS SHOULD CONSULT WITH THEIR TAX PROFESSIONAL CONCERNING COMPLIANCE WITH AND THE AFFECT OF BOTH STATE AND FEDERAL TAX LAWS ON THEIR INTEREST BEFORE THEY CAST A BALLOT TO ACCEPT OR REJECT THE PLAN.**

**THE ACCOUNTANTS, ATTORNEYS, AND THE MANAGEMENT OF THE DEBTOR MAKE NO REPRESENTATIONS HEREIN CONCERNING THE IMPACT OF THE TAX LAW ON ANY INDIVIDUAL TREATED UNDER THE PLAN.**

## ARTICLE X
## MANAGEMENT OF THE DEBTORS

**A.      Directors and Officers of the Debtors**

Mohammed Nasr is the sole limited partner of Beltway and holds a 99% interest in the business.  Mr. Nasr will continue as an Officer and owner of the Debtors from and after the Effective Date of the Plan.

## ARTICLE XI
## CONCLUSION

The information provided in this Disclosure Statement is intended to assist you in voting on the Plan in an informed fashion.  If the Plan is confirmed, you will be bound by its terms. Accordingly, you are urged to make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

Respectfully submitted this 3rd day of April, 2019

L REIT, LTD.

By: _____
Mohammad Nasr
Managing Member of L REIT, LLC,
General Partner of L REIT, Ltd.

BELTWAY 7 PROPERTIES, LTD.

By: _____
Mohammad Nasr
Managing Member of Beltway 7 Properties,
LLC, General Partner of Beltway 7
Properties Ltd.

Edward L. Rothberg
State Bar No. 17313990
rothberg@hooverslovacek.com
Melissa A. Haselden

State Bar No. 00794778
haselden@hooverslovacek.com
Vianey Garza
State Bar No. 24083057
garza@hooverslovacek.com
5051 Westheimer, Suite 1200
Houston, Texas 77056

*Attorneys for Debtors and Debtors in Possession*

# EXHIBIT A

## PLAN

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **L REIT, LTD,** *et al.* | § | **CASE NO. 18-36881-H2-11** |
| | § | **(Jointly Administered)** |
| Debtors. | § | |

**JOINT PLAN OF REORGANIZATION FILED BY DEBTORS
L REIT, LTD. AND BELTWAY 7 PROPERTIES, LTD.**

OF COUNSEL:

HOOVER SLOVACEK LLP
Edward L. Rothberg
State Bar No. 17313990
rothberg@hooverslovacek.com
Melissa A. Haselden
State Bar No. 00794778
haselden@hooverslovacek.com
Vianey Garza
State Bar No. 24083057
garza@hooverslovacek.com
5051 Westheimer, Suite 1200
Houston, Texas 77056
Telephone: (713) 977-8686
Facsimile: (713) 977-5395

*Attorneys for Debtors and Debtors in Possession*

## TABLE OF CONTENTS

**ARTICLE I GENERAL PURPOSES OF THE PLAN** ................................................................. 1

**ARTICLE II DEFINITIONS**................................................................................................... 3

    Section 2.1   Definitions. ........................................................................................... 3

    Section 2.2   Interpretation. ....................................................................................... 9

    Section 2.3   Application of Definitions and Rules of Construction Contained in the
Bankruptcy Code. .............................................................................................. 10

    Section 2.4   Other Terms......................................................................................... 10

**ARTICLE III ADMINISTRATIVE AND PRIORITY CLAIMS** ......................................... 10

    Section 3.1   Administrative Claims Bar Date. ........................................................ 10

    Section 3.2   Payment of Administrative Claims. .................................................... 10

    Section 3.3   Payment of United States Trustee Fees Incurred Prior to Confirmation..... 10

    Section 3.4   Payment of United States Trustee Fees Subsequent to Confirmation......... 10

    Section 3.5   Payment to Professionals. ................................................................... 11

**ARTICLE IV CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**
................................................................................................................................................ 11

    Section 4.1   Class 1. Secured Claim of the Secured Noteholder against L REIT........... 11

    Section 4.2   Class 2. Allowed Secured M&M Claims against L REIT ......................... 12

    Section 4.3   Class 3.  Allowed General Unsecured Claims Against L REIT.................. 12

    Section 4.4   Class 4.  Allowed Secured Claim of the Mezzanine Lender Against Beltway
    7.             12

    Section 4.5   Class 5. Allowed Claims of Beltway's General Unsecured Creditors........ 13

    Section 4.6   Class 6. Allowed Claims of Affiliates and Insiders ................................... 13

    Section 4.7   Class 7. Equity Interests In L REIT. ...................................................... 13

    Section 4.8   Class 8. Equity Interests In Beltway. ...................................................... 14

**ARTICLE V VOTING OF CLAIMS AND INTERESTS**...................................................... 14

**ARTICLE VI MEANS FOR EXECUTION OF PLAN** ......................................................... 14

    Section 6.1   Sale of the Real Properties. .................................................................. 14

    Section 6.2   Release of Liens. .................................................................................. 14

    Section 6.3   Sale Free and Clear. ............................................................................. 15

    Section 6.4   Distribution of Net Sale Proceeds. ....................................................... 15

    Section 6.5   Preservation of Litigation Claims ........................................................ 15

    Section 6.6   Litigation Reserve. .............................................................................. 16

    Section 6.7   Funding the Plan.................................................................................. 16

    Section 6.8   Disbursing Agent................................................................................. 16

Section 6.9     Exclusive Rights and Duties of the Disbursing Agent. ............................... 16

Section 6.10    Presumption of Disbursing Agent's Authority. ....................................... 17

Section 6.11    Limitation on Disbursing Agent's Liability. ........................................... 17

Section 6.12    Establishment and Maintenance of Disputed Claims Reserve. .................. 18

Section 6.13    Delivery of Distributions. ...................................................................... 18

Section 6.14    Manner of Payment under the Plan. ......................................................... 19

Section 6.15    Time Bar for Cash Payments. ................................................................. 19

Section 6.16    Unclaimed Property ............................................................................... 19

Section 6.17    Minimum Payment. ................................................................................ 19

Section 6.18    Fractional Dollars. ................................................................................. 19

Section 6.19    Distribution Dates. ................................................................................ 20

Section 6.20    Orders Respecting Claims Distribution. ................................................... 20

Section 6.21    Continued Operations. ........................................................................... 20

Section 6.22    Agreements, Instruments and Documents. ................................................ 20

Section 6.23    Further Authorization. ........................................................................... 20

**ARTICLE VII CRAMDOWN AND CLAIMS ALLOWANCE** ............................................ **20**

Section 7.1     Cramdown. ............................................................................................ 20

Section 7.2     Allowance of Claims under the Plan. ....................................................... 21

Section 7.3     Objection Deadline. ............................................................................... 21

Section 7.4     Prosecution of Objections. ..................................................................... 21

**ARTICLE VIII DEFAULT** ........................................................................................... **21**

Section 8.1     Events of Default. .................................................................................. 21

Section 8.2     Remedies. .............................................................................................. 21

**ARTICLE IX EXECUTORY CONTRACTS AND LEASES** ............................................... **22**

Section 9.1     Assumption and Rejection. ..................................................................... 22

Section 9.2     Rejection Claims. ................................................................................... 22

Section 9.3     Payment of Rejection Claims. ................................................................. 22

**ARTICLE X MODIFICATION OF THE PLAN** ............................................................... **22**

Section 10.1    Modification. ......................................................................................... 22

**ARTICLE XI CONDITIONS PRECEDENT** ................................................................... **23**

Section 11.1    Conditions to Confirmation. ................................................................... 23

Section 11.2    Waiver and Nonfulfillment of Conditions to Confirmation. ....................... 23

Section 11.3    Confirmation Order Provisions for Pre-Effective Date Actions. ............... 23

Section 11.4    Conditions to the Effective Date. ........................................................... 23

Section 11.5   Waiver and Nonfulfillment of Conditions to Effective Date. ................... 23

**ARTICLE XII JURISDICTION OF THE BANKRUPTCY COURT ................................... 24**

Section 12.1   Retention of Bankruptcy Court Jurisdiction............................................. 24

Section 12.2   Failure of the Bankruptcy Court to Exercise Jurisdiction. ....................... 25

**ARTICLE XIII EFFECT OF CONFIRMATION ...................................................................... 25**

Section 13.1   Binding Effect. ....................................................................................... 25

Section 13.2   Satisfaction of Claims and Interests. ....................................................... 26

Section 13.3   Vesting of Property. ............................................................................... 26

Section 13.4   Discharge................................................................................................ 26

Section 13.5   Injunction ............................................................................................... 26

Section 13.6   Preservation of Setoff Rights. ................................................................. 26

Section 13.7   Releases................................................................................................... 27

Section 13.8   Exculpation............................................................................................. 27

Section 13.9   Guarantors. ............................................................................................. 27

Section 13.10   Lawsuits. ............................................................................................... 28

Section 13.11   Insurance. .............................................................................................. 28

Section 13.12   U.S. Trustee Fees. ................................................................................. 28

Section 13.13   Term of Stays. ....................................................................................... 28

**ARTICLE XIV MISCELLANEOUS PROVISIONS ............................................................... 28**

Section 14.1   Corporate Authority. .............................................................................. 28

Section 14.2   Documentation. ...................................................................................... 29

Section 14.3   Integration Clause. ................................................................................. 29

Section 14.4   Primacy of the Plan and Confirmation Order.......................................... 29

Section 14.5   Severability............................................................................................. 29

Section 14.6   No Admission.......................................................................................... 29

Section 14.7   Bankruptcy Restrictions. ........................................................................ 29

Section 14.8   Governing Law........................................................................................ 30

Section 14.9   Closing of Case. ..................................................................................... 30

Section 14.10   Successors and Assigns.......................................................................... 30

Section 14.11   Notices.................................................................................................. 30

Section 14.12   Validity and Enforceability. ................................................................... 31

Section 14.13   Plan Supplement..................................................................................... 31

**PLAN OF REORGANIZATION**

In accordance with Sections 1121 and 1106 of the Bankruptcy Code, Debtors, L REIT, Ltd. ("**L REIT**") and Beltway 7 Properties, Ltd. ("**Beltway**" and collectively with L REIT the "**Debtors**"), files this Plan of Reorganization ("**Plan**") as follows:

**ARTICLE I**
**GENERAL PURPOSES OF THE PLAN**

L REIT is a Texas limited partnership located in Houston, Texas and formed as a special purpose entity in 2012 for the purpose of acquiring, developing, and owning commercial property in Houston, Harris County.  L REIT owns seven (7) office buildings located at 7840, 7850, 7900, 7904, 7906, 7908 N. Sam Houston Pkwy W and 10740 N. Gessner Dr. Houston, Texas (the "**Real Properties**").

The Real Properties comprise a Class A commercial office complex situated on a 14-acre tract of real property and strategically located in North Houston along Beltway 8 near Heron Lake Estates.  The Real Properties were originally designed and developed between 2002 to 2010 as individual projects by Mohammad Nasr. The aggregate net rentable area for the Real Properties is about 315,000 sq. feet

As a result of tenants leaving the Real Properties, L REIT's cash flows began to suffer.  As a stop gap measure, Mr. Nasr personally covered most of the monthly deficiencies for L REIT to ensure that the debt service and current operating were expenses paid.  After approximately one (1) year of covering the shortfalls, Mr. Nasr was no longer able to fund the shortfalls for L REIT.

During the last few months prior to the bankruptcy filing, L REIT consulted with several real estate brokers to market the Real Properties and attempted to work with the various lenders to secure forbearances in payment terms in order to provide additional time for L REIT to increase occupancy levels or sell the Real Properties.  No global agreement could be reached.  Facing eventual foreclosure on the Real Properties by the lenders or execution on the pledge of Beltway 7's interest in L REIT by the Mezzanine Lender, the Debtors were left with no alternative but to seek protection under Chapter 11 of the Bankruptcy Code.

This bankruptcy was filed to allow the Debtors sufficient time to market and sell the Real Properties, with proceeds to be distributed in accordance with the priorities established in the Bankruptcy Code and set out herein.  As set forth in this Disclosure Statement and the Plan, the Debtors believe selling the Real Properties or the equity in Beltway 7 in accordance with the Bidding Procedures will provide the greatest return to creditors.

Since the filing of the case, the Debtors have taken steps to sell the Real Properties and have employed Avison Young ("**Avison**"), a national broker, to assist them with this process.  The Debtors have also retained Avison to lease unoccupied space thereby increasing the overall value

of the Real Properties to the eventual purchase. Finally, the Debtors have filed Bidding Procedures which they believe will maximize the value of the Real Properties for the benefit of the Debtors' creditors. The Sale Proceeds from the sale of the Real Properties will be the primary source of funding for this Plan. Other sources of funding will be from Other Assets and Net Litigation Proceeds.

The Plan provides for payment to Creditors as follows:

| Class | Type of Claim or Equity Interest (*Impairment*) | Approx. Amount of Claims and Interests | Treatment of Claims or Interests | Percentage Recovery Under Plan |
|---|---|---|---|---|
| 1 | L REIT Secured (*Unimpaired*) | $50,608,757.79[1] | Assumption or Payment in Full from the Sale Proceeds | 100% |
| 2 | L REIT Secured (*Impaired*) | $70,264.87 | Payment in Full from the Sale Proceeds Without Interest | 100% |
| 3 | L REIT General Unsecured (*Impaired*) | $367,920.68 | Payment in Full from Net Sale Proceeds Without Interest | 100% |
| 4 | Beltway 7 Secured (*Unimpaired*) | $7,284,802.79[2] | Assumption or Payment in Full from Net Sale Proceeds With Interest | 100% |
| 5 | Beltway 7 General Unsecured (*Impaired*) | $0.00 | If any, Payment in Full from Net Sale Proceeds, Without Interest | 100% |
| 6 | L REIT Insider (*Impaired*) | $3,650,539.91 | To the Extent Proceeds Are Sufficient, Payment in Full from Net Sale Proceeds With Interest. If proceeds are insufficient, then Pro Rata Without Interest. | 100% |
| 7 | Equity Interests in L REIT (*Impaired*) | 100% | To the extent proceeds are sufficient to pay all creditors in Classes 1–6 in full, any surplus proceeds paid to Class 7 | Unknown |

---

[1] Represents principal amount plus non-default interests allegedly owed per the Secured Noteholder's proof of claim. Additional interest, fees and costs may ultimately be due to the Secured Noteholder.
[2] Represents principal amount plus non-default interests allegedly owed per the Mezzanine Lender's proof of claim. Additional interest, fees and costs may ultimately be due to the Mezzanine Lender.

| Class | Type of Claim or Equity Interest (*Impairment*) | Approx. Amount of Claims and Interests | Treatment of Claims or Interests | Percentage Recovery Under Plan |
|---|---|---|---|---|
| 8 | Equity Interests in Beltway 7 (*Impaired*) | 100% | To the extent proceed are paid to Class 7, all of such proceeds shall be transferred to Class 8. | Unknown |

Total distributions will not exceed the amount of any Allowed Claim.

## ARTICLE II
## DEFINITIONS

**Section 2.1** **Definitions.** For purposes of this Plan, the following terms and definitions have the following meanings unless the context clearly indicates otherwise:

2.1.1 "Administrative Claim" means any Claim that is defined in Section 503(b) of the Bankruptcy Code as being an "administrative expense" within the meaning of such section.

2.1.2 "Allowed Claim" or "Allowed Interest" means a Claim or Interest (a) in respect of which a proof of claim or application has been filed with the Court within the applicable period of limitations fixed by Bankruptcy Rule 3001 or, by order of this Court, (b) scheduled in the list of Creditors prepared and filed with the Bankruptcy Court pursuant to Bankruptcy Rule 1007(b) and not listed as disputed, contingent or liquidated as to amount, in either case as to which no objection to the allowance thereof has been interposed within any applicable period of limitations fixed by Bankruptcy Rule 3001 or an order of the Bankruptcy Court, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending.

2.1.3 "Allowed General Unsecured Claim" means an allowed claim that is not an Administrative Claim, a Secured Claim, or a Priority Claim.

2.1.4 "Avoidance Actions" means those causes of action provided for under Sections 547 to 551 of the Bankruptcy Code, causes of action under applicable non-bankruptcy law for voidable transfers or similar legal theories, such as the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, as enacted.

2.1.5     "Bankruptcy Code" means the Bankruptcy Code, 11 U.S.C. § 101 et seq., and any amendments thereof.

2.1.6     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, in which L REIT's Chapter 11 case, pursuant to which the Plan is proposed, is pending, and any Court having competent jurisdiction to hear appeals or certiorari proceedings therefrom.

2.1.7     "Bankruptcy Rules" means the rules of procedure in bankruptcy cases applicable to cases pending before the Bankruptcy Court and local bankruptcy rules as adopted by the Bankruptcy Court.

2.1.8     "Bar Date" means April 22, 2018, the deadline established by the Bankruptcy Court in in the Notice of Chapter 11 Bankruptcy Case, fixing the date by which proofs of claim must be filed except for those claims specified in this plan, and such claims will have the bar dates established herein.

2.1.9     "Beltway" means Beltway 7 Properties, Ltd, debtor herein.

2.1.10    "Bid" means a proposal, solicitation or offer made by a party in accordance with the Bidding Procedures.

2.1.11    "Bidding Procedures" means the *Bidding Procedures for the Sale of Debtors' Real Properties and Certain Related Assets* approved by the Bankruptcy Court on _____ and appearing at Docket No. _____.

2.1.12    "Bidding Procedures Order" means the Order (A) Approving Sale and Bidding Procedures In Connection With Sale of Assets; (B) Approving The Form and Manner of The Notice of (i) Sale Hearing And (ii) Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases and Proposed Cure Costs Relating Thereto and (C) Scheduling A Sale Hearing and appear at Docket No. ____.

2.1.13    "Cash" means Cash and Cash equivalents including, without limitation, checks and wire transfers.

2.1.14    "Chapter 11 Cases" means the two (2) jointly administered cases, Case Nos. 18-36881 and 18-36883, filed under chapter 11 of the Bankruptcy Code by the Debtors and pending before the Bankruptcy Court.

2.1.15    "Claim" means any right to payment, or right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, against the Debtors in existence on or before the Petition Date, whether or not such right to payment or right to equitable remedy is reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured or unsecured.

2.1.16    "Class" means any class into which Allowed Claims or Allowed Interests are classified pursuant to Article 4.

2.1.17    "Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims, Class 6 Claims, Class 7 Interests and Class 8 Interests," means the Allowed Claims and Interests so classified in Sections 4.1 through 4.8 respectively.

2.1.18    "Closing Date" means the date the sale of the Real Properties closes.

2.1.19    "Confirmation Date" means the date upon which the Confirmation Order is entered by the Clerk of the Bankruptcy Court.

2.1.20    "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan.

2.1.21    "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan.

2.1.22    "Creditors" means all creditors of holding claims for debts, liabilities, or demands of any character whatsoever, as defined in Section 101(10) of the Bankruptcy Code.

2.1.23    "Debtors" means L REIT, Ltd. and Beltway 7 Properties, Ltd, debtors herein.

2.1.24    "Disbursing Agent" means the Debtors and/or their duly appointed agent or agents.

2.1.25    "Disclosure Statement" means the written document filed by the Debtors in accordance with Section 1125(b) of the Bankruptcy Code containing information sufficient to enable a hypothetical reasonable investor typical of holders of Claims or Interests of the relevant Class to make an informed judgment about this Plan.

2.1.26    "Disallowed Claim" means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

2.1.27    "Disputed Claim" means that portion (including, where appropriate, the whole) of any Claim that (a) is listed in the Debtors schedules of liabilities as

disputed, contingent, or unliquidated; (b) is listed in the Debtors schedules of liabilities and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent the proof of claim exceeds the scheduled amount; (c) is not listed in a the Debtors schedules of liabilities, but as to which a proof of claim has been filed with the Bankruptcy Court; or (d) as to which an objection to a proof of claim has been filed and has not become an Allowed Claim.

2.1.28    "Effective Date" means the Closing Date.

2.1.29    "Equity Interest" means the respective partnership interests in each of the Debtors.

2.1.30    "Executory Contract(s)" means any Pre-petition Unexpired lease(s) or executory contract(s) of the Debtors within the meaning of Section 365 of the Bankruptcy Code.

2.1.31    "Final Order" means an Order of the Bankruptcy Court which, not having been stayed, and the time to appeal from which, or to seek review or certiorari or rehearing, has expired and such Order has become conclusive upon all matters adjudicated thereby, and in full force and effect.

2.1.32    "General Unsecured Claim" means either (i) a Claim that is not secured by a lien, security interest or other charge against or interest in property in which the Debtors has an interest or which is not subject to setoff under Section 553 of the Bankruptcy Code or (ii) a Claim that is secured in one of the foregoing manners to the extent the amount of the Claim exceeds the value of the property securing the Claim.

2.1.33    "Holder" means the owner or holder of any Claim or Interest.

2.1.34    "Icon" means BancorpSouth f/k/a Icon Bank.

2.1.35    "Icon Lien" means the disputed junior Lien on the Real Properties in the estimated amount of $11,000,000.

2.1.36    "Interest" means an interest or equity interest (a) in respect to which a proof of interest has been filed with the Bankruptcy Court within the applicable period of limitation fixed by Bankruptcy Rule 3001 or (b) scheduled in the list of equity security holders prepared and filed with the Bankruptcy Court pursuant to Bankruptcy Rule 1007(b).

2.1.37    "Insider" has the meaning set forth in Section 101(31) of the Bankruptcy Code.

2.1.38    "Lien" means a "lien" as defined in Section 101(37) of the Bankruptcy Code.

2.1.39    "Litigation" means any action, claim, lawsuit, demand, investigation or proceeding pending or threatened against the Debtors before any court, board, commission, agency or instrumentality of any federal, state, local or foreign government or of any agency or subdivision thereof or before any arbitrator or panel of arbitrators.

2.1.40    "Litigation Payments" means all compensation, damages, penalties, interest, costs and other payments, if any, paid, payable or to become payable by the Debtors in relation to any of the Litigation, whether such compensation, damages, penalties, interest, costs or other payments are paid, payable or will become payable pursuant to a court order made at trial or upon appeal or pursuant to the terms of any settlement or other resolution of any of the Litigation.

2.1.41    "L REIT" means L REIT, Ltd., Debtor herein.

2.1.42    "M&M Lien" means a properly filed mechanics and materialmen's Lien filed pursuant to Tex. Prop. Code § against one or more of the Real Properties

2.1.43    "M&M Lien Claim" means a Secured Claim arising in connection with an M&M Lien.

2.1.44    "M&M Lien Claimant" means a person holding an Allowed M&M Lien Claim.

2.1.45    "Mezzanine Lender" means Annaly CRE Holdings LLC.

2.1.46    "Net Litigation Proceeds" means the proceeds actually received by the Debtors from the full and final determination or settlement of each Litigation claim after deduction of: (i) any Litigation Payments related to such Litigation; and (ii) all costs and expenses incurred by or on behalf of the Debtors related to such claim including, without limitation, all fees and expenses of legal counsel, advisors and experts and all out-of-pocket travel, filing, reproduction and other costs; and (iii) any cash taxes payable in respect of such proceeds after taking into account any available tax credits or deductions, any tax sharing arrangements and any tax elections available to the Debtors or the recipient of the Net Litigation Proceeds that would minimize the amount of cash taxes payable (including any elections to reduce any purchase price associated with the Litigation).

2.1.47    "Net Sale Proceeds" means the sales price of the Real Properties net of (i) all respective necessary and actual costs and expenses associated with such

transaction (including, without limitation, commission reasonable attorneys' fees and other costs, fees and expenses; (ii) payment of the Allowed Secured Claims including the Class 1 Secured Claim of the Secured Noteholder and the Class 2 Secured Claims of the M&M Lien Claimants; (iii) payment of unpaid Allowed Administrative Claims related to the Chapter 11 Cases of the Debtors, including, professional fees and expenses and US Trustee fees; (iv) accrued, unpaid ad valorem property taxes with respect to the Real Properties and (v) sufficient funds to pay required post confirmation operational expenses, US Trustee fees, and fees and costs to fund litigation of Litigation and Claim Objections, not to exceed $100,000.

2.1.48    "Other Assets" means all assets of the Debtors, other than the Real Properties.

2.1.49    "Person" means an individual, corporation, partnership, joint venture, trust, estate, unincorporated organization, or a government or any agency or political subdivision thereof.

2.1.50    "Petition Date" means December 5, 2018 or the date of filing of the Debtors' Chapter 11 Cases.

2.1.51    "Plan" means this Join Plan of Reorganization in its present form, or as it may be amended or supplemented from time to time.

2.1.52    "Priority Claim" means any Claim that is defined in Section 507(a)(2)-(8) of the Bankruptcy Code.

2.1.53    "Pro Rata" means the proportion that the amount of such Claim bears to the aggregate amount of Claims in each respective Class.

2.1.54    "Purchase and Sale Agreement" means the agreement for the purchase and sale of the Real Properties between the Debtors and Purchaser.

2.1.55    "Purchaser" means the ultimate purchaser of the Real Properties pursuant to the Bidding Procedures.

2.1.56    "Qualified Bid" means a duly executed writing from a Qualified Bidder that (i) offers to purchase the Real Properties at a price stated in the Bid; (ii) states that the Qualified Bidder is prepared to enter into and consummate the transaction by a date to be stated in the Sale Motion; (iii) states that such offer to purchase is irrevocable; (iv) designates any executory contract that, as a condition of closing, must be assumed and assigned; and (v) is accompanied by a deposit in an amount stated in the Bidding Procedures.

2.1.57    "Qualified Bidder" means any prospective purchaser who submits a Qualified Bid and that Debtors determine has the ability to close on a sale of the Real Properties.

2.1.58    "Real Properties" means collectively the real properties owned by L REIT and located at 7840, 7850, 7900, 7904, 7906, 7908 N. Sam Houston Pkwy W and 10740 N. Gessner Dr. Houston, Texas.

2.1.59    "Sale" means the sale of the Debtors' Real Properties and related assets including, but not limited to, Executory Contracts.

2.1.60    "Sale Motion" means the Motion for Order (A) Approving Sale and Bidding Procedures In Connection With Sale of Assets; (B) Approving The Form and Manner of The Notice of (i) Sale Hearing And (ii) Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases and Proposed Cure Costs Relating Thereto and (C) Scheduling A Sale Hearing filed by the Debtors on _____ and appearing as Docket No. _____.

2.1.61    "Sale Proceeds" means the gross proceeds from the Sale.

2.1.62    "Secured Claim" means a Claim secured by a lien, security interest or other charge against or interest in property in which the Debtors has an interest, or which is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value (determined in accordance with Section 506(a) of the Bankruptcy Code) of the interest of the holder of such Claim in the Debtors' interest in such property or to the extent of the amount subject to such setoff, as the case may be.

2.1.63    "Secured Noteholder" means Wells Fargo Bank, National Association, as Trustee for the benefit of the registered holders of JPMBB Commercial Mortgage Securities Trust 2014-C26, Commercial Mortgage Pass-Through Certificates, Series 2014-C26.

2.1.64    "Substantial Consummation" means the substantial consummation of the transactions contemplated by this Plan. Substantial Consummation will occur on the Effective Date.

2.1.65    "Successful Bid" means the Qualified Bid which is selected as the winning bid and submitted to the Bankruptcy Court for approval.

**Section 2.2    Interpretation.** Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective sections, articles of or exhibits to the Plan, as the same may be amended, waived or modified from time to time.  The headings and table of contents in the Plan are for convenience of reference only and will not limit or otherwise affect the provisions

of the Plan. Words denoting the singular number include the plural number and vice versa and words denoting one gender include the other gender. All exhibits and schedules attached to the Plan are incorporated herein by such attachment.

**Section 2.3      Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.** Words and terms defined in the Bankruptcy Code have the same meaning when used in the Plan, unless a different definition is given in the Plan. The rules of construction contained in Section 102 of the Bankruptcy Code apply to the construction of the Plan.

**Section 2.4      Other Terms.** The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A term used but not defined herein has the meaning ascribed to that term, if any, in the Bankruptcy Code.

## ARTICLE III
## ADMINISTRATIVE AND PRIORITY CLAIMS

**Section 3.1      Administrative Claims Bar Date.** Except for administrative expenses incurred in the ordinary course of operating L REIT's business, or administrative claims allowed by prior order of the Bankruptcy Court, any Holder of an Administrative Claim (including any cure Claims for Executory Contracts or leases that are assumed pursuant to this Plan) against the Debtors will file an application for payment of such Administrative Claim on or within sixty (60) days of the Effective Date with actual service upon counsel for the Debtors. If such application is not filed by such date, the Holders of such Administrative Claims will be forever barred and extinguished, and such Holder will, with respect to any such Administrative Claim, be entitled to no distribution and no further notices.

**Section 3.2      Payment of Administrative Claims.** Each Holder of an unpaid Allowed Administrative Claim will be paid in Cash, in full, from the Sale Proceeds and Other Assets on the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless the Holder of such Claim agrees to a different treatment. The Debtors reserve all rights to surcharge the Collateral of any secured creditor, including but not limited to the Secured Noteholder, under 11 U.S.C. § 506. The Secured Noteholder disputes the Debtors' right to surcharge the Real Properties

**Section 3.3      Payment of United States Trustee Fees Incurred Prior to Confirmation.** All fees incurred pursuant to 28 U.S.C. § 1930(a)(6) for time periods prior to entry of the Confirmation Order will be paid by the Debtors on or before the Effective Date.

**Section 3.4      Payment of United States Trustee Fees Subsequent to Confirmation.** The Disbursing Agent will be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) entry of the Confirmation Order. After confirmation, Disbursing Agent must

file with the Bankruptcy Court and serve on the United States Trustee a monthly financial report for each month (or portion thereof) the case remains open in a format prescribed by the United States Trustee and provided to the Debtors by the United States Trustee.

**Section 3.5    Payment to Professionals.** All payments to professionals for actual, necessary services and costs advanced in behalf of the bankruptcy up until the Confirmation Date will be pursuant to Bankruptcy Court order and subject to the restrictions of Bankruptcy Code Section 330. Professional fees incurred for services rendered and costs advanced subsequent to the Effective Date will be the liability of Disbursing Agent.

**ARTICLE IV**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

Subject to all other applicable provisions of the Plan (including its distribution provisions), classified Claims and Interests will receive the treatment set forth below. The Plan will not provide any distributions on account of a Claim or Interest to the extent that such Claim or Interest has been disallowed, released, withdrawn, waived, settled, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third party guarantors, sureties, or insurers, whether governmental or nongovernmental. The Plan will not provide any distributions on account of a Claim or Interest, the payment of which has been assumed by a third party.

**Section 4.1    Class 1. Secured Claim of the Secured Noteholder against L REIT**

4.1.1    Classification. Class 1 consists of the Allowed Secured Claim of the Secured Noteholder.

4.1.2    Treatment

(i)    Option 1. In accordance with 11 U.S.C. §1124(a)(2) the Debtors and/or the Purchaser will (A) cure all defaults including removal of the Icon Lien; (B) reinstate the maturity of the debt as such maturity existed before default; (C) compensate the Holder of the Class 1 Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or applicable law; (D) if the Class 1 Claim arises from any failure to perform a nonmonetary obligations, compensates the Holder of the Class 1 Claim for any actual pecuniary loss incurred by the Class 1 Claim Holder as a result of such failure.

(ii)    Option 2. Unless the Secured Noteholder's debt is assumed by the Purchaser as part of the Sale, the Class 1 Secured Claim will be paid-in-full with interest from the Sale Proceeds.

4.1.3    Impairment. Unimpaired.

**Section 4.2      Class 2. Allowed Secured M&M Claims against L REIT**

4.2.1      <u>Classification</u>.  Class 2 consists of the Allowed Secured M&M Lien Claims of the M&M Lien Claimants.

4.2.2      <u>Treatment</u>.  After payment of the Class 1 Claim, Class 2 Claims will be paid-in-full from the Sale Proceeds, without interest

4.2.3      <u>Impairment</u>.  Impaired.

**Section 4.3      Class 3.  Allowed General Unsecured Claims Against L REIT.**

4.3.1      <u>Classification</u>.   Class 3 consists of Allowed Claims of L REIT's General Unsecured Creditors except for the Class 6 Claims of Affiliates and Insiders.

4.3.2      <u>Treatment</u>.  After payment of all Class 1 and Class 2 Claims will be paid-in-full from the Net Sale Proceeds, Other Assets, and Net Litigation Proceeds without interest.  If the Net Sale Proceeds, Other Assets, and Net Litigation Proceeds are insufficient to pay Class 3 Claims in full, Holders of Class 3 Claims will be paid on a Pro Rata from the assets.

4.3.3      <u>Impairment</u>.  Impaired.

**Section 4.4      Class 4.   Allowed Secured Claim of the Mezzanine Lender Against Beltway 7.**

4.4.1      <u>Classification</u>:  Class 4 consists of the Allowed Secured Claim of the Mezzanine Lender.

4.4.2      Treatment

(i)      <u>Option 1</u>.  In accordance with 11 U.S.C. §1124(a)(2) the Debtors and/or the Purchaser will (A) cure all defaults including removal of the Icon Lien; (B) reinstate the maturity of the debt as such maturity existed before default; (C) compensate the Holder of the Class 4 Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or applicable law; (D) if the Class 4 Claim arises from any failure to perform a nonmonetary obligations, compensates the Holder of the Class 4 Claim for any actual pecuniary loss incurred by the Class 4 Claim Holder as a result of such failure.

(ii)      <u>Option 2</u>:  Unless the Mezzanine Lender's debt is assumed, it will receive, after payment of all Class 1, Class 2 and Class 3 Claims,  payment in full with interest from the Net Sale Proceeds, Other Assets, and Net Litigation Proceeds. If the Net Sale Proceeds, Other Assets, and Net Litigation Proceeds are insufficient

to pay the Mezzanine Lender's Claim in full, all remaining proceeds from the assets.

    4.4.3    <u>Impairment</u>.  Unimpaired.

**Section 4.5**    **Class 5. Allowed Claims of Beltway's General Unsecured Creditors**

    4.5.1    <u>Classification</u>. Allowed Claims of Beltway's General Unsecured Creditors

    4.5.2    <u>Treatment</u>.  After payment of all Class 1, Class 2, Class 3 and Class 4 Claims, Class 5 Claims, if any, will be paid-in-full without interest from the Net Sale Proceeds, Other Assets, and Net Litigation Proceeds.  If the Net Sale Proceeds, Other Assets, and Net Litigation Proceeds are insufficient to pay Class 5 Claims, if any, in full, Class 5 Claims will be paid on a Pro Rata from the remaining assets.

    4.5.3    <u>Impairment</u>.  Impaired.

**Section 4.6**    **Class 6. Allowed Claims of Affiliates and Insiders**

    4.6.1    <u>Classification</u>.  Class 6 consists of the Allowed Claims of L REIT's Affiliates and Insiders.

    4.6.2    <u>Treatment</u>.  After payment of all Class 1, Class 2, Class 3, Class 4 and Class 5 Claims, Class 6 Claims will be paid-in-full with interest from the Net Sale Proceeds, Other Assets, and Net Litigation Proceeds.  If the Net Sale Proceeds, Other Assets, and Net Litigation Proceeds are insufficient to pay Class 6 Claims in full, Class 6 Claims will be paid on a Pro Rata from the remaining assets without interest.

    4.6.3    <u>Impairment</u>.  Impaired.

**Section 4.7**    **Class 7. Equity Interests In L REIT.**

    4.7.1    <u>Classification</u>.  Class 7 consists of the 1% General Partnership Interest held by L REIT, LLC and the 99% Limited Partnership Interest of Beltway 7 Properties, Ltd.

    4.7.2    <u>Treatment</u>.  After payment of all Class 1, Class 2, Class 3, Class 4, Class 5, and Class 6 Claims, Class 7 Equity Interests will receive proportionate distributions from any remaining Net Sale Proceeds, Other Assets, and Net Litigation Proceeds with interest.  If there are insufficient funds to pay all Allowed Claims in Classes 1 through 6 in full, Class 7 Interests will receive nothing.

4.7.3     <u>Impairment</u>.  Impaired.

**Section 4.8     <u>Class 8. Equity Interests In Beltway.</u>**

4.8.1     <u>Classification</u>.  Class 8 consists of the 1% General Partnership Interest held by Beltway 7 Management, LLC and the 99% Limited Partnership Interest of Mohammad Nasr.

4.8.2     <u>Treatment</u>.  After payment of all Class 1, Class 2, Class 3, Class 4, Class 5, Class 6 Claims, and Class 7 Equity Interests, Class 8 Equity Interests will receive proportionate distributions from any remaining Net Sale Proceeds, Other Assets, and Net Litigation Proceeds.  If there are insufficient funds to pay all Allowed Claims in Classes 1 through 6 in full, Class 8 Interests will receive nothing.

4.8.3     <u>Impairment</u>.  Impaired.

**ARTICLE V**
**VOTING OF CLAIMS AND INTERESTS**

Allowed Class 2 Claims, Class 3 Claims Class 5 Claims, Class 6 Claims, Class 7 Interests and Class 8 Interests are impaired under the Plan and entitled to vote.  Class 1 and Class 4 Claims are unimpaired and presumed to have accepted the Plan.

**ARTICLE VI**
**MEANS FOR EXECUTION OF PLAN**

**Section 6.1     <u>Sale of the Real Properties.</u>** The Plan provides for the sale of the Real Properties in connection with the Sale Motion and Bidding Procedures which will allow Qualified Bidders to submit Qualified Bids in connection with Bankruptcy Court approved Bid Procedures. The Successful Bid will be submitted to the Bankruptcy Court for approval and entry of the Sale Order.  The Sale Order must be entered prior to the Effective Date.  The Sale Proceeds will be distributed pursuant to the terms of the Plan.  Alternatively, the Debtors may retain the Real Properties by implementing Treatment Option 1 for the Class 1 and Class 4 Claim Holders along with paying all other creditors in full with interest.  Debtors may elect this alternative by filing a notice with the Bankruptcy Court five (5) business days prior to the Confirmation Hearing.

**Section 6.2     <u>Release of Liens.</u>** Unless assumed by the Purchaser, at the Closing Date of the Sale, all holders of Liens on any of the Real Properties, including Class 1 and Class 2 Secured Claims, will be deemed to have released their respective Liens as provided in this Plan, and such Holders must execute any and all instruments reasonably requested to confirm or effectuate such release.  Liens will attach to the Sale Proceeds in the same priority as they previously attached to the respective Real Properties, except that the Icon Lien will not attach to any Sale Proceeds or

Net Sale Proceeds and will not be paid through this Plan.  Unless Mr. Nasr is able to reach a settlement with Icon to release its lien, Debtors will file an adversary proceeding to void the lien.

**Section 6.3      Sale Free and Clear.** Upon Closing, all right, title and interest of the Debtors and their respective Estates in and to the Real Properties will vest in the Purchaser free and clear of all Claims, Liens, encumbrances, interests, restrictions, easements, leases, tenancies, agreements of sale and other title objections, except that any Liens assumed by the Purchaser will continue to encumber the Real Properties to the same validity, extent and priority as existed prior to the Effective Date.

**Section 6.4      Distribution of Net Sale Proceeds.** Net Sale Proceeds will be distributed in accordance with the terms of Articles 3, 4 and 6 herein.

**Section 6.5      Preservation of Litigation Claims** The potential Litigation Claims, in addition, include, but are not limited to, those claims listed on **Exhibit B**.  As of the Effective Date, pursuant to Section 1123(b)(3)(B) of the Code, any and all Litigation Claims accruing to the Debtors and Debtors-in-Possession, including, without limitation, Litigation Claims, including under Sections 510, 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Code, shall become vested assets of the Debtors' respective estates, and the Debtors or Disbursing Agent hall have the authority to commence and prosecute such Litigation Claims for the benefit of each Debtors respective estate and Holders of Allowed Claims and Allowed Equity Interests. The Debtors or Disbursing Agent shall be entitled to pursue Litigation Claims in his/her own name or the name of the Debtor.

In addition to the above, there may be numerous Litigation Claims which currently exist or may subsequently arise that are not set forth specifically herein because the facts upon which such Litigation Claims are not fully or currently known by the Debtors. The failure to list any such Litigation Claim is not intended to limit the rights of the Liquidating Agent to pursue such Litigation Claims at such time as the facts giving rise thereto become fully known.

After the Effective Date, the Debtors or Disbursing Agent shall have the sole authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such Litigation Claims without Bankruptcy Court approval.

After the Effective Date of the Plan all causes of action shall remain the property of each Debtors' respective estate, and, if pursued and any recovery is ultimately realized, the proceeds of any such recovery would ultimately become property of the estate and disbursed pursuant to the terms of the Plan.  Inasmuch as the Debtors' investigations of such claims are in its initial phase, the Debtors are unable to provide any meaningful estimate of the total amount that could be recovered and/or avoided.

**Section 6.6**    **Litigation Reserve.** The Debtors or Disbursing Agent and the professionals they may retain to pursue Litigation Claims are limited in their ability to prosecute and defend the Litigation Claims by the amount of $100,0000. Neither the Debtors or Disbursing Agent nor the professionals they retain has any obligation to prosecute or defend any Litigation Claim in the absence of available funds in the Litigation Reserve.  The Debtors or Disbursing Agent and the professionals shall file a motion to withdraw upon at least 30 days notice with respect to his obligations. The Debtors or Disbursing Agent are not obligated to prosecute or defend any Litigation Claim on a contingency or non-compensated basis.

**Section 6.7**    **Funding the Plan.** The source of funds to achieve consummation of and carry out the Plan will be (i) proceeds of the sale of the Real Properties; (ii) Other Assets and (iii) any Net Litigation Proceeds, which are to be utilized to satisfy Claims in the manner and order of priority in Articles 3, 4 and 6 herein.

**Section 6.8**    **Disbursing Agent.** The Debtors and/or their agents will act as the Disbursing Agent.  If the Debtors and/or their agents choose not to act as the Disbursing Agent, then they may designate a substitute.

**Section 6.9**    **Exclusive Rights and Duties of the Disbursing Agent.** The duties of the Disbursing Agent will be as follows:

6.9.1    Distribution to Creditors with Administrative Claims. In accordance with Article 3 of the Plan, the Disbursing Agent will pay the Administrative Claims first out of Cash on hand generated from operations and then from the Sale Proceeds and then from the Other Assets, if any.

6.9.2    Distributions to Creditors with Allowed Claims. The Disbursing Agent will have the sole right and duty to make the distributions provided for hereunder as set forth in Article 4 of the Plan.

6.9.3    Powers of the Disbursing Agent. The Disbursing Agent will have full power and authority to do the following:

6.9.4    Make disbursements to Administrative Creditors in accordance with Article 3 and other Creditors in accordance with Article 4 of the Plan.

6.9.5    File all reports required under law, including state and federal tax returns, and to pay all taxes incurred by the Bankruptcy Estate.

6.9.6    Take any and all actions, including the filing or defense of any civil actions or Claim objections necessary to accomplish the above.

6.9.7    Employ and pay reasonable fees and expenses of such attorneys, accountants, and other professionals, as may be deemed necessary to accomplish the above and will be entitled to reserve sufficient Cash to pay the projected fees and costs to such Professionals on a post-confirmation basis, and will be authorized to purchase insurance with such coverage and limits as are reasonably necessary, including covering liabilities incurred in connection with its service as Disbursing Agent.

6.9.8    Suspend distribution to any Creditor that has not provided the Disbursing Agent with its Federal Tax Identification number or social security number, as the case may be.

**Section 6.10    Presumption of Disbursing Agent's Authority.** In no case will any party dealing with the Disbursing Agent in any manner whatsoever be obligated to see that the terms of its engagement have been complied with, or be obligated or privileged to inquire into the necessity or expediency of any act of the Disbursing Agent, or to inquire into any other limitation or restriction of the power and authority of the Disbursing Agent, but as to any party dealing with the Disbursing Agent in any manner whatsoever in relation to the assets, the power of the Disbursing Agent to act or otherwise deal with said property will be absolute except as provided under the terms of the Plan.

**Section 6.11    Limitation on Disbursing Agent's Liability.**

6.11.1    Except gross negligence or willful misconduct, no recourse will ever be had directly or indirectly against the Disbursing Agent personally or against any employee of the Disbursing Agent by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Disbursing Agent pursuant to this Plan, or by reason of the creation of any indebtedness by the Disbursing Agent for any purpose authorized by the Plan, it being expressly understood and agreed that all such liabilities, covenants and agreements of the Disbursing Agent or any such employee, whether in writing or otherwise will be enforceable only against and be satisfied only out of the assets of the Bankruptcy Estate and every undertaking, contract, covenant or agreement entered into in writing by the Disbursing Agent will provide expressly against the personal liability of the Disbursing Agent.

6.11.2    The Disbursing Agent will not be liable for any act the Disbursing Agent may do or omit to do as Disbursing Agent hereunder while acting in good faith and in the exercise of the best judgment of the Disbursing Agent and the fact that such act or omission was advised, directed or approved by an attorney acting as attorney for the Disbursing Agent, will be evidence of such good faith and best

judgment; nor will the Disbursing Agent be liable in any event except for gross negligence or willful default or misconduct of the Disbursing Agent.

**Section 6.12    Establishment and Maintenance of Disputed Claims Reserve.**

6.12.1    Distributions made in respect of any Disputed Claims will not be distributed, but will instead be deposited by the Disbursing Agent into an account styled "Disputed Claims Reserve".  The funds in this account will be held in trust for the benefit of the Holders of all Disputed Claims.

6.12.2    Unless and until the Bankruptcy Court determines that a good and sufficient reserve for any Disputed Claim is less than the full amount thereof, the calculations required by the Plan to determine the amount of the distributions due to the Holders of Allowed Claims and to be reserved for Disputed Claims will be made as if all Disputed Claims were Allowed Claims in the full amount claimed by the Holders thereof.  No payment or distribution will be made with respect to any Claim to the extent it is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

6.12.3    At such time as a Disputed Claim becomes an Allowed Claim the distributions due on account of such Allowed Claim and accumulated by the respective Debtor (including the Pro Rata share of any dividends or interest earned in respect of such distributions) will be released from the account and paid by the respective Debtor to the Holder of such Allowed Claim.

6.12.4    At such time as any Disputed Claim is finally determined not to be an Allowed Claim, the amount on reserve in respect thereof will be released from the account and returned to the Disbursing Agent for distribution to other Creditors holding Allowed Claims.

6.12.5    The Disbursing Agent will not be required to withhold funds or consideration, designate reserves, or make other provisions for the payment of any Claims that have been Disallowed by a Final Order of the Bankruptcy Court as of any applicable time for distribution under the Plan, unless the Bankruptcy Court orders otherwise or unless the Court's order of disallowance has been stayed.

**Section 6.13    Delivery of Distributions.** Subject to Bankruptcy Rule 9010 and the provisions of the Plan, distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such a Holder if no proof of Claim or proof of Equity Interest is filed or if the Disbursing Agent has been notified in writing of a change of address), except as provided below. If any Holder's distribution is returned as undeliverable, no further distributions to such Holder

will be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed distributions will be made to such Holder without interest. Amounts in respect of undeliverable distributions will be returned to the Disbursing Agent until such distributions are claimed.

      **Section 6.14**   **Manner of Payment under the Plan.** All payments made by the Disbursing Agent will be by check and regular mail. However, at the option of the Disbursing Agent, payment may be made by wire transfer or otherwise provided that the recipient pays all costs that exceed payment by check and regular mail

      **Section 6.15**   **Time Bar for Cash Payments.** Checks issued by the Disbursing Agent in respect of Allowed Claims will be null and void if not negotiated within six (6) months after the date of issuance thereof.  Requests for reissuance of any check will be made directly to the Disbursing Agent by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check will be made on or before the later of (a) the first anniversary of the Effective Date or (b) ninety (90) days after the date of reissuance of such check.  After such date, all Claims in respect of void checks will be discharged and forever barred.

      **Section 6.16**   **Unclaimed Property.** If any Person entitled to receive distributions under the Plan cannot be located within a reasonable period of time after the Effective Date, the distributions such Person would be entitled to receive will be held by the Disbursing Agent in a segregated interest-bearing account.  If the Person entitled to any such distributions is located within six (6) months after the Effective Date, such distributions, together with any dividends and interest earned thereon, will be paid and distributed to such Person.  If such Person cannot be located within such period, such distributions and any dividends and interest thereof will be returned to Disbursing Agent and such Person will have waived and forfeited its right to such distributions.  Nothing contained in this Plan will require the Disbursing Agent to attempt to locate such Person.  It is the obligation of each Person claiming rights under the Plan to keep the Disbursing Agent advised of current address by sending written notice of any changes to the Disbursing Agent.

      **Section 6.17**   **Minimum Payment.** The minimum amount of any distribution will be $25. If a payment anticipated by the Plan is due in an amount less than $25, then such payments is hereby waived and the funds will be retained by Disbursing Agent.

      **Section 6.18**   **Fractional Dollars.** Any other provision of the Plan notwithstanding, no payments of fractional dollars will be made to any Holder of an Allowed Claim.  Whenever any payment of a fraction of a dollar to any holder of an Allowed Claim would otherwise be called for,

the actual payment made will reflect a rounding of such fraction to the nearest whole dollar (up or down).

**Section 6.19    Distribution Dates.** Whenever any distribution to be made under the Plan is due on a day other than a Business Day, such distribution will instead be made, without penalty or interest, on the next Business Day.   The Bankruptcy Court will retain power, after the Confirmation Date, to extend distribution dates for cause, upon motion and after notice and a hearing (as defined in Bankruptcy Code Section 102) to affected parties.

**Section 6.20    Orders Respecting Claims Distribution.** After confirmation of the Plan, the Bankruptcy Court will retain jurisdiction to enter orders in aid of consummation of the Plan respecting distributions under the Plan and to resolve any disputes concerning distributions under the Plan.

**Section 6.21    Continued Operations.** The Debtors will continue to operate after the Effective Date, solely in order to distribute the funds necessary to make payments to Creditors holding administrative Claims, pursue Litigation Claims and to engage in the Claims resolution process pursuant to Article 7.

**Section 6.22    Agreements, Instruments and Documents.** All agreements, instruments and documents required under the Plan to be executed or implemented, together with such others as may be necessary, useful, or appropriate in order to effectuate the Plan will be executed on or before the Effective Date or as soon thereafter as is practicable.   Disbursing Agent will have a power of attorney, coupled with an interest, to execute and deliver any Plan Document to the extent that counterparty to such document fails to execute and deliver any document required to effectuate the Plan following 20 days written notice and request to such counterparty.

**Section 6.23    Further Authorization.** Disbursing Agent will be entitled to seek such orders, judgments, injunctions, and rulings from the Bankruptcy Court, in addition to those specifically listed in the Plan, as may be necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.  The Bankruptcy Court will retain jurisdiction to enter such orders, judgments, injunctions and rulings.

**ARTICLE VII**
**CRAMDOWN AND CLAIMS ALLOWANCE**

**Section 7.1    Cramdown.** In the event any Class rejects the Plan, the Debtors will seek to invoke the provisions of Section 1129(b) of the Bankruptcy Code and confirm the Plan notwithstanding the rejection of the Plan by any Class of Claims or Interests.  The treatment

afforded each Creditor in each Class in the event of a cramdown will be the same as that provided for in the plan as the case may be.

**Section 7.2     Allowance of Claims under the Plan.** Allowance is a procedure whereby the Bankruptcy Court determines the amount and enforceability of Claims against the Debtors, if the parties cannot agree upon such allowance.  It is expected that the Debtors and/or the Disbursing Agent will file objections to Claims of Creditors, if any are deemed necessary, before and after confirmation of the Plan.  The Plan merely provides for payment of Allowed Claims, but does not attempt to pre-approve the allowance of any Claims.

**Section 7.3     Objection Deadline.** As soon as practicable, but in no event later than one hundred twenty (120) days after the Effective Date, unless extended by order of the Bankruptcy Court for cause, objections to Claims will be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made.

**Section 7.4     Prosecution of Objections.** On and after the Effective Date, except as the Bankruptcy Court may otherwise order, the filing, litigation, settlement or withdrawal of all objections to Claim and Reserved Avoidance Actions may be made by Disbursing Agent and/or Disbursing Agent.

**ARTICLE VIII**
**DEFAULT**

**Section 8.1     Events of Default.**  If any of the following events occur, Disbursing Agent will be in breach of this Plan ("**Default**"):

8.1.1     Failure to pay any amount due under the Plan when due; or

8.1.2     Breach or violation of a material covenant or uncured default under the Plan, including failure to pay amounts due.

**Section 8.2     Remedies.**  Should Disbursing Agent be in breach or violation under the foregoing paragraph, or Default has occurred and thereafter Disbursing Agent fails to remedy or resolve such breach within fourteen (14) calendar days from the date of the written notice, or ten (10) calendar days from receipt of the written notice fourteen (14) days of such breach, violation or default, then any Creditor owed a distribution, which Disbursing Agent fails to make when due, at its option, may declare that Disbursing Agent is in default of this Plan and the creditor may (a)

enforce its claim(s), (b) exercise any and all rights and remedies under applicable non-bankruptcy law, and (c) seek such relief as may be appropriate in the Bankruptcy Court.

## ARTICLE IX
## EXECUTORY CONTRACTS AND LEASES

**Section 9.1     Assumption and Rejection.** L REIT will assume all commercial leases related to the Real Properties which will be assigned to the Purchaser on the Closing Date. The Debtors will reject all executory contracts and leases and all other such agreements, which have not been otherwise assumed in this Plan or by prior Bankruptcy Court order.  A list of the leases and executory contracts assumed by the Debtors is attached as **Exhibit A**.

**Section 9.2     Rejection Claims.** Any Claims arising from rejection of an executory contract or lease must be filed on or before twenty (20) days from the Closing Date.  Otherwise, such Claims are forever barred and will not be entitled to share in any distribution under the Plan. Any Claims arising from rejection, if timely filed and allowed, will be treated as General Unsecured Claims.

**Section 9.3     Payment of Rejection Claims.** Except as specifically provided for herein, the Debtors must pay all cure claims in the amount listed on **Exhibit A** on or before thirty (30) days after the Administrative Claims Bar Date set in paragraph 3.1 and 3.2, unless a Claim is filed before the Administrative Claims Bar Date in an amount different from that set forth on **Exhibit A**, in which case the cure claim will be paid when and if allowed by Final Order of the Bankruptcy Court.

## ARTICLE X
## MODIFICATION OF THE PLAN

**Section 10.1    Modification.** The Debtors may propose amendments and modifications of this Plan prior to the Confirmation Date with leave of the Bankruptcy Court upon appropriate notice.  After the Confirmation **Date**, the Debtors may, with approval of the Bankruptcy Court, so long as it does not materially or adversely affect the interests of the Creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the intent of this Plan.  After the Confirmation Date, the Debtors may, with approval of the Bankruptcy Court, modify the Plan as to any Class, even though such modification materially affects the rights of the Creditors or Interest Holders in such Class; provided, however, that such modifications must be accepted as to Classes of Creditors by at least sixty-six and two-thirds percent (66-2/3%) in amount of Allowed Claims voting in each such Class and fifty-one percent (51%) in number of Allowed Claims voting in such Class, and as to Classes of Interest Holders by at least sixty-six and two-thirds percent (66-2/3%) in amount of Allowed Interests voting in each such Class; and provided, further, that additional disclosure material needed to support such modification will be approved by the Bankruptcy Court in the manner

consistent with Section 1125 of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure. With respect to all proposed modifications to the Plan both before and after confirmation, the Debtors will comply with the requirements of Section 1127 of the Bankruptcy Code.

## ARTICLE XI
## CONDITIONS PRECEDENT

**Section 11.1    Conditions to Confirmation.** Confirmation of the Plan will not occur, and the Bankruptcy Court will not enter the Confirmation Order unless (a) all of the requirements of the Bankruptcy Code for confirmation of the Plan with respect to the Debtors have been satisfied (b) the Bidding Procedures have been approved by the Bankruptcy Court. In addition, confirmation will not occur, the Plan will be null and void and of no force and effect, and the Plan will be deemed withdrawn unless the Bankruptcy Court has entered all other orders (which may be orders included within the Confirmation Order) required to implement the Plan.

**Section 11.2    Waiver and Nonfulfillment of Conditions to Confirmation.** Nonfulfillment of any condition to confirmation of the Plan may be waived only by the Debtors. In the event that the Debtors determines that the conditions to the Plan's confirmation which it may waive cannot be satisfied and should not, in its discretion, be waived, the Debtors may propose a new plan, may modify this Plan as permitted by law, or may request other appropriate relief.

**Section 11.3    Confirmation Order Provisions for Pre-Effective Date Actions.** The Confirmation Order will empower and authorize the Debtors to take or cause to be taken, prior to the Closing Date, all actions which are necessary to enable it to implement the provisions of the Plan and satisfy all other conditions precedent to the effectiveness of the Plan.

**Section 11.4    Conditions to the Effective Date.** The following are conditions precedent to the effectiveness of the Plan: (i) the Plan is confirmed and the Confirmation Order has become a Final Order; (ii) Debtors do not withdraw the Plan at any time prior to the Effective Date; and (iii) the Debtors have sufficient Cash on hand to make the initial payments and distributions required under the Plan.

**Section 11.5    Waiver and Nonfulfillment of Conditions to Effective Date.** Nonfulfillment of any condition set forth in the immediately foregoing paragraph of the Plan may be waived only by the Debtors. If the Debtors determine that the conditions to the Plan's Effective Date set forth in the immediately foregoing paragraph of this Plan cannot be satisfied and should

not, in its sole discretion, be waived, the Debtors may propose a new plan, may modify this Plan as permitted by law, or may request other appropriate relief.

## ARTICLE XII
## JURISDICTION OF THE BANKRUPTCY COURT

**Section 12.1    Retention of Bankruptcy Court Jurisdiction.** Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Bankruptcy Court will retain exclusive jurisdiction of this case after the Confirmation Date with respect to the following matters:

12.1.1    To allow, disallow, reconsider (subject to Bankruptcy Code Section 502(j) and the applicable Bankruptcy Rules) Claims and to hear and determine any controversies pertaining thereto;

12.1.2    To estimate, liquidate, classify or determine any Claim against the Debtors, including claims for compensation or reimbursement;

12.1.3    To resolve controversies and disputes regarding the interpretation and implementation of the Plan, including entering orders to aid, interpret or enforce the Plan and to protect the Debtors and any other entity having rights under the Plan as may be necessary to implement the Plan;

12.1.4    To hear and determine any and all applications, contested matters, or adversary proceedings arising out of or related to this Plan or this case or as otherwise might be maintainable under the applicable jurisdictional scheme of the Bankruptcy Code prior to or after confirmation and consummation of the Plan whether or not pending on the Confirmation Date;

12.1.5    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated;

12.1.6    To liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

12.1.7    To adjudicate all Claims to any lien on any of the Debtors' assets;

12.1.8    To hear and determine matters concerning state, local and federal taxes pursuant to the Bankruptcy Code, including (but not limited to) Sections 346, 505 and 1146 thereof and to enter any order pursuant to Bankruptcy Code Section 505 or otherwise to determine any tax of the Debtors, whether before or after confirmation, including to determine any and all tax effects of the Plan;

12.1.9    To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan or to modify the Plan as provided by applicable law;

12.1.10    To determine all questions and disputes regarding title to assets and shares of the Debtors, Disbursing Agent or of the Bankruptcy Estate, as may be necessary to implement the Plan;

12.1.11    To enforce and to determine actions and disputes concerning the releases contemplated by the Plan and to require persons holding Claims being released to release Claims in compliance with the Plan;

12.1.12    To fix the value of collateral in connection with determining Claims;

12.1.13    To enter a final decree closing the case and making such final administrative provisions for the case as may be necessary or appropriate; and

12.1.14    To, even after entry of a final decree, hear any cases enforcing Bankruptcy Code Section 525.

**Section 12.2    Failure of the Bankruptcy Court to Exercise Jurisdiction.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under or related to the Chapter 11 case, including the matters set forth in Section 12.1 of the Plan, this Article 12 will have no effect upon and will not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**ARTICLE XIII**
**EFFECT OF CONFIRMATION**

**Section 13.1    Binding Effect.** As provided for in Section 1141(d) of the Bankruptcy Code, the provisions of the Plan bind the Debtors, any entity acquiring property under the Plan and any Creditor, Interest Holder, or shareholder of the Debtors, whether or not the Claim or Interest of such Creditor or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder has accepted the Plan.  After confirmation, the property dealt with by the Plan will be free and clear of all Claims and Interests of Creditors and Equity Holders, except

to the extent as provided for in the Plan as the case may be. The Confirmation Order will contain an appropriate provision to effectuate the terms of this paragraph 13.1.

Section 13.2    **Satisfaction of Claims and Interests.** Holders of Claims and Interests will receive the distributions provided for in this Plan, if any, in full settlement and satisfaction of all such Claims, and any interest accrued thereon, and all Interests.

Section 13.3    **Vesting of Property.** Except as otherwise expressly provided in the Plan or the Confirmation Order, pursuant to Section 1141(b) of the Bankruptcy Code, upon the Effective Date, all Property of the Bankruptcy Estate will vest in Disbursing Agent free and clear of all Claims, liens, encumbrances, charges or other Interests of Creditors and Interest Holders.

Section 13.4    **Discharge.** Pursuant to Section 1141(d) of the Bankruptcy Code, upon the Closing Date, the Debtors will be discharged from any debt that arose before the date of such confirmation, and any debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of the Claim based on such debt is filed or deemed filed under Section 501 of this title; such Claim is allowed under Section 502 of this title; or the Holder of such Claim has accepted the Plan.

Section 13.5    **Injunction**   The Confirmation Order will include a permanent injunction prohibiting the collection of Claims against Disbursing Agent in any manner other than as provided for in the Plan. All Holders of Claims will be prohibited from asserting against the Debtors, Disbursing Agent or any of its assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such Holder filed a proof of Claim. Such prohibition will apply whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or (c) the Holder of a Claim based upon such debt has accepted the Plan. This injunction also permits Disbursing Agent to enforce 11 U.S.C. Section525(a) upon improper revocation or restriction of licenses.

Section 13.6    **Preservation of Setoff Rights.** In the event that the Debtors has a Claim of any nature whatsoever against the Holders of Claims, the Debtors may, but is not required to setoff against the Claim (and any payments or other distributions to be made in respect of such Claim hereunder), subject to the provisions of Section 553 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors of any Claim that the Debtors has against the Holder of Claims. Neither this provision nor the injunctive provision of the Confirmation Order will impair the existence of any right of setoff or recoupment that may be held by a Creditor herein; provided that the exercise of such right, will not be permitted unless the Creditor provides the Debtors with written notice of the intent to affect such setoff or recoupment. If the Debtors or the Disbursing Agent, as applicable, objects in writing within twenty (20) business days following the receipt of such notice, such

exercise will only be allowed upon order of the Bankruptcy Court.  In the absence of timely objection, the Creditor may implement the proposed setoff or recoupment against the Claim held by the Bankruptcy Estate.

**Section 13.7    Releases.** On the Effective Date and pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, the Debtors, Disbursing Agent, and to the maximum extent provided by law, their agents, release and forever discharge all claims, including acts taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into or any other act taken or entitled to be taken in connection with the Plan or this case against the following, whether known or unknown:

13.7.1    Mohammad Nasr, Peter Trevino and John Trevino, their employees, agents, affiliates attorneys and representatives (the "**Insider Released Parties**"), in connection with any and all claims and causes of action arising on or before the Confirmation Date that may be asserted by or on behalf of the Debtors or the Bankruptcy Estate and/or on account of the Debtors' Chapter 11 Cases will be released.  The release of these Insider Released Parties will be conditioned upon the occurrence of the Effective Date.

13.7.2    The Debtors' Professionals will be released from any and all claims and liabilities other than gross negligence and willful misconduct or except as otherwise provided under the Professional Code of Responsibility.

13.7.3    Neither the releases contemplated by this Section 13.7, nor any provisions of this Plan, will release claims against non-debtor third parties.

**Section 13.8    Exculpation.** None of the Debtors or the Insider Released Parties, nor any of their respective present members, officers, directors, employees or professionals will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct, and in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**Section 13.9    Guarantors.** Nothing herein will be deemed to release the liability of any non-debtor guarantor to a Creditor.  However, so long as the Debtors are current with respect to

all of its obligations under this Plan and the Confirmation Order Creditors may not pursue collection of their Claims from any guarantor.  If the Debtors commits an uncured default in its obligations hereunder, then and only then may Creditors seek relief against guarantors.

**Section 13.10  Lawsuits.**  On the Effective Date, all lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of Claims against the Debtors and any guarantor except proof of Claim and/or objections thereto pending in the Bankruptcy Court will be dismissed as to the Debtors and/or Disbursing Agent.  Such dismissal will be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan.  All parties to any such action will be enjoined by the Bankruptcy Court by the Confirmation Order from taking any action to impede the immediate and unconditional dismissal of such actions. All lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a claim(s) by the Debtors or any entity proceeding in the name of or for the benefit of the Debtors against a person will remain in place only with respect to the claim(s) asserted by the Debtors or such other entity, and will become property of the Post-Confirmation Disbursing Agent to prosecute, settle or dismiss as it sees fit.

**Section 13.11  Insurance.** Confirmation and consummation of the Plan will have no effect on insurance policies of the Debtors or Disbursing Agent in which the Debtors or any of the Debtors' representatives or agents is or was the insured party; Disbursing Agent will become the insured party under any such policies without the need of further documentation other than the Plan and entry of the Confirmation Order.  Each insurance company is prohibited from denying, refusing, altering or delaying coverage on any basis regarding or related to the Debtors' bankruptcy, the Plan or any provision within the Plan.

**Section 13.12  U.S. Trustee Fees.**  The Disbursing Agents will timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree closing this Chapter 11 case, or enters an order either converting these cases to cases under Chapter 7 or dismisses the cases.  After confirmation, Disbursing Agent will file with the Bankruptcy Court and will transmit to the United States Trustee a true and correct statement of all disbursements made by them for each month or portion thereof, which these Chapter 11 cases remain open in a format prescribed by the United States Trustee.

**Section 13.13  Term of Stays.**  Except as otherwise provided in the Plan, the stay provided for in this case pursuant to Bankruptcy Code Section 362 will remain in full force and effect until the Effective Date.

**ARTICLE XIV**
**MISCELLANEOUS PROVISIONS**

**Section 14.1   Corporate Authority.** All actions and transactions contemplated under the Plan will be authorized upon confirmation of the Plan without the need of further board or

stockholder resolutions, approval, notice or meetings, other than the notice provided by serving this Plan on all known Creditors of the Debtors, all Interest Holders, and all current directors of the Debtors.

**Section 14.2** **Documentation.** the Debtors, all Creditors and other parties in interest required to execute releases, termination statements, deeds, bills of sale or other documents required by the Plan, will be ordered and directed to execute such documents as are necessary in order to effectuate the terms of this Plan.  The Bankruptcy Court may determine that the failure of any party to execute a required document will constitute contempt of the Bankruptcy Court's Confirmation Order, which will require such documents to be executed in accordance with the terms of the Plan and the Confirmation Order.  On the Effective Date, all documents and instruments contemplated by the Plan not requiring execution and delivery prior to the Confirmation Date will be executed and delivered by the Debtors, and Creditors, as the case may be.  All Documents will be consistent with the terms of the Plan and will otherwise be subject to approval as to form by all respective counsel.

**Section 14.3** **Integration Clause.** This Plan is a complete, whole, and integrated statement of the binding agreement between the Debtors, Creditors, Equity Interests and the parties-in-interest upon the matters herein.  Parole evidence will not be admissible in an action regarding this Plan or any of its provisions.

**Section 14.4** **Primacy of the Plan and Confirmation Order.** To the extent of any conflict or inconsistency between the provisions of the Plan on the one hand, and the Confirmation Order on the other hand, the provisions of the Confirmation Order will govern and control.

**Section 14.5** **Severability.** Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the proponent may modify the Plan as provided herein so that such provision will not be applicable to the Holder of any Claim or Equity Interest.  Such a determination of unenforceability will not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

**Section 14.6** **No Admission.** Neither the filing of the Plan, nor Disclosure Statement, nor any statement or provision contained herein, nor the taking by the Debtors of any action with respect to the Plan will (i) be or be deemed to be an admission against interest and (ii) until the Effective Date, be or be deemed to be a waiver of any rights which the Debtors may possess against any other party.  If the Effective Date does not occur, neither the Plan, Disclosure Statement nor any statement contained herein may be used or relied upon in any manner in any suit, action, proceeding or controversy within or outside of the Debtors' case.

**Section 14.7** **Bankruptcy Restrictions.** From and after the Effective Date, the Debtors will no longer be subject to the restrictions and controls provided by the Bankruptcy Code or Rules

(e.g., section 363, section 364, rule 9019), the Bankruptcy Court, or the United States Trustee's guidelines.  The Disbursing Agent may, on behalf of the Debtors, compromise Claims and/or controversies post-Effective Date without the need of notice or Bankruptcy Court approval.  No monthly operating reports will be filed after the Effective Date; however, the Disbursing Agent will provide the U.S. Trustee such financial reports as provided above and as the U.S. Trustee may reasonably request until the entry of a final decree.

**Section 14.8** <u>**Governing Law.**</u> Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or the law of the jurisdiction of organization of any entity, the internal laws of the State of Texas will govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan or the Chapter 11 case, including the documents executed pursuant to the Plan.

**Section 14.9** <u>**Closing of Case.**</u> As soon as the Debtors has either obtained substantial consummation or otherwise performed its obligations under the Plan Disbursing Agent will seek the entry of an Order of the Court closing this case.

**Section 14.10** <u>**Successors and Assigns.**</u> The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

**Section 14.11** <u>**Notices.**</u> All notices or requests in connection with the Plan will be in writing and given by mail addressed to:

> L REIT, Ltd./Beltway 7 Properties, Ltd.
> 7904 N. Sam Houston Pkwy West
> Houston, TX 77064
> Attn: Mohammad Nasr
>
> with copies to:
> Melissa A. Haselden
> Hoover Slovacek LLP
> Galleria Tower II
> 5051 Westheimer, Suite 1200
> Houston, Texas 77056

All notices and requests to Persons holding any Claim or Interest in any Class will be sent to them at their last known address or to the last known address of their attorney of record in the case.  Any such holder of Claim or Interest may designate in writing any other address for purposes of this section, which designation will be effective upon receipt by the Debtors.

**Section 14.12 <u>Validity and Enforceability.</u>** The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Should any provision in this Plan be determined by the Court or any appellate court to be unenforceable following the Effective Date, such determination will in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

**Section 14.13 <u>Plan Supplement.</u>** Any and all exhibits or schedules not filed with the Plan will be contained in a Plan Supplement to be filed within ten (10) days of the Confirmation Hearing.

Respectfully submitted this 3rd day of April, 2019

L REIT, LTD.

By: */s/ Mohammad Nasr (signed by permission)*
Mohammad Nasr
Managing Member of L REIT, LLC,
General Partner of L REIT, Ltd.

BELTWAY 7 PROPERTIES, LTD.

By: */s/ Mohammad Nasr (signed by permission)*
Mohammad Nasr
Managing Member of Beltway 7 Properties,
LLC, General Partner of Beltway 7
Properties Ltd.

Melissa A. Haselden
State Bar No. 00794778
Edward L. Rothberg
State Bar No. 17313990
Vianey Garza
State Bar No. 24083057
5051 Westheimer, Suite 1200
Houston, Texas 77056

*Attorneys for Debtors and Debtors in Possession*

# **PLAN EXHIBIT A**

# **EXECUTORY CONTRACTS TO BE ASSUMED AND PROPOSED CURE AMOUNTS**

| Contract Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|
| Service Now, Inc.<br>7900 Sam Houston Pkwy. W.<br>Suite 100<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Segal Co (Western States), Inc.<br>7900 Sam Houston Pkwy. W.<br>Suite 110<br>Houston, TX, 77064 | Real Property Lease | $0.00 |
| Los Cucos, Sam Houston Card Club & Grill<br>7900 Sam Houston Pkwy. W.<br>Suite 125<br>Houston, TX, 77064 | Real Property Lease | $0.00 |
| Heron Lakes Golf Course Basement<br>7900 Sam Houston Pkwy. W.<br>Suite 150B<br>Houston, TX, 77064 | Real Property Lease | $0.00 |
| American Int'l Relocation Sol.<br>7900 Sam Houston Pkwy. W.<br>Suite 200<br>Houston, TX, 77064 | Real Property Lease | $0.00 |
| Coperion Corporation<br>7900 Sam Houston Pkwy. W.<br>Suite 201<br>Houston, TX, 77064 | Real Property Lease | $0.00 |
| Connect the Dots, Inc.<br>7900 Sam Houston Pkwy. W.<br>Suite 250<br>Houston, TX, 77064 | Real Property Lease | $0.00 |
| Bartlett Cocke<br>7904 West Sam Houston Pkwy. W<br>Suite 100<br>Houston, TX 77064 | Real Property Lease | $0.00 |

| Contract Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|
| M Nasr and Partners<br>7904 West Sam Houston Pkwy. W<br>Suite 102<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Byers Engineering<br>7904 West Sam Houston Pkwy. W<br>Suite 200<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| D. Stavinhoa<br>7904 West Sam Houston Pkwy. W<br>Suite 300<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Motorola<br>7904 West Sam Houston Pkwy. W<br>Suite 325<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Caldwell Watson Real Estate Group<br>7904 West Sam Houston Pkwy. W<br>Suite 300<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Caldwell Watson Real Estate Group<br>7904 West Sam Houston Pkwy. W<br>Suite 400<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Icon Bank of Texas/BanCorp South<br>7906 West Sam Houston Pkwy. W<br>Suite 100<br>Houston, TX 7706 | Real Property Lease | $0.00 |
| HMH<br>7906 West Sam Houston Pkwy. W<br>Suite 102<br>Houston, TX 77064 | Real Property Lease | $0.00 |

| Contract Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|
| Houston Hospice<br>7906 West Sam Houston Pkwy. W<br>Suite 200<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| J D R Cable<br>7906 West Sam Houston Pkwy. W<br>Suite 201<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Integrity Gas Services<br>7906 West Sam Houston Pkwy. W<br>Suite 203<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Liberty Oilfield<br>7906 West Sam Houston Pkwy. W<br>Suite 250<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Icon Bank of Texas/BanCorp South<br>7908 West Sam Houston Pkwy. W<br>Suite 100<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Seaway<br>7908 West Sam Houston Pkwy. W<br>Suite 200<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| My Computer Career<br>7908 West Sam Houston Pkwy. W<br>Suite 300<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Quanta TeleCommunications<br>7908 West Sam Houston Pkwy. W<br>Suite 500<br>Houston, TX 77064 | Real Property Lease | $0.00 |

| Contract Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|
| Bankers Life<br>10740 N. Gessner Rd<br>Suite 101<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Icon Bank/BanCorp South<br>10740 N. Gessner Rd<br>Suite 201<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Icon Bank/BanCorp South<br>10740 N. Gessner Rd<br>Suite 201A<br>Houston, TX 7706 | Real Property Lease | $0.00 |
| Sodexo Remote Site<br>10740 N. Gessner Rd<br>Suite 202<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Texas Ears and Nose<br>10740 N. Gessner Rd<br>Suite 302<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Corestaff Support Services, Inc.<br>10740 N. Gessner Rd<br>Suite 410<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Pearsons<br>10740 N. Gessner Rd<br>Suite 420<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Surge (Expansion)<br>7850 Sam Houston Pkwy. W<br>Suite 100<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Granite Harbor Advisors, Inc.<br>7850 Sam Houston Pkwy. W<br>Suite 270<br>Houston, TX 77064 | Real Property Lease | $0.00 |

| Contract Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|
| Rusty Brents Insurance Agency<br>7850 Sam Houston Pkwy. W<br>Suite 280<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Surge Operation<br>7850 Sam Houston Pkwy. W<br>Suite 200/300<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Intergraph Corporation<br>7840 Sam Houston Pkwy. W<br>Suite 100-200<br>Houston, TX 77064 | Real Property Lease | $0.00 |
| Global Logix<br>7840 Sam Houston Pkwy. W<br>Suite 300<br>Houston, TX 77064 | Real Property Lease | $0.00 |

# PLAN EXHIBIT B

# RESERVED LITIGATION CLAIMS

- Cause No. 2018-43063, *L REIT Ltd. v. Bethel Deli LLC d/b/a Victors on the Green and Chauvila Mathew Individually, Guarantor*, in the 334th District Court, Harris County, Texas

- Cause No. 2018-07367, *L REIT, Ltd. vs. Education Management II, LLC fka Education Management LLC aka Education Management Corporation, and The Art Institute of Houston, LLC, Dream Center Educational Holdings, and The Art Institute of Houston, LLC d/b/a Art Institute of Houston*, in the 234th District Court, Harris County, Texas

- Proof of Claim No. 22 filed in Case No. 18-11531, *In re The Art Institute of Houston, Inc.*, pending in the United States Bankruptcy Court for the District of Delaware.

- Proof of Claim No. 74 filed in Case No. 18-11494, *In re Education Management II, LLC*, pending in the United States Bankruptcy Court for the District of Delaware.

- Proof of Claim No. 109 filed in the Case No. 18-11502, *In re Education Management, LLC*, pending in the United States Bankruptcy Court for the District of Delaware.

## EXHIBIT B

## CLAIMS ANALYSIS

| | | | | | | | | Filed as Secured | | Allowed |
|---|---|---|---|---|---|---|---|---|---|---|
| Sch.# | Name | End-note | Class | Scheduled Claim Amount | D/U/C | POC# | Date Filed | Filed Claim Amount | Priority Unsecured | Obj Doc# | Unsecured Claim Amount |

**L REIT, Ltd.** — Secured Claims: Classes 1 and 2

| Sch.# | Name | End-note | Class | Scheduled Claim Amount | D/U/C | POC# | Date Filed | Filed Claim Amount | Secured Priority Unsecured | Obj Doc# | Allowed Unsecured Claim Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | BancorpSouth | 1 | - | $10,463,628.40 | D | | | | | | $0.00 |
| | Cypress Fairbanks ISD | 2 | - | $5,804.78 | - | 2 | 12/12/2018 | $663,978.89 | Secured | | $663,978.89 |
| | Cypress Fairbanks ISD | 2 | - | $84,960.00 | - | | | | | | |
| | Cypress Fairbanks ISD | 2 | - | $68,112.00 | - | | | | | | |
| | Cypress Fairbanks ISD | 2 | - | $76,102.70 | - | | | | | | |
| | Cypress Fairbanks ISD | 2 | - | $92,900.39 | - | | | | | | |
| | Cypress Fairbanks ISD | 2 | - | $2,094.28 | - | | | | | | |
| | Cypress Fairbanks ISD | 2 | - | $19,244.15 | - | | | | | | |
| | Cypress Fairbanks ISD | 2 | - | $146,350.21 | - | | | | | | |
| | Cypress Fairbanks ISD | 2 | - | $88,049.87 | - | | | | | | |
| | Cypress Fairbanks ISD | 2 | - | $80,360.51 | - | | | | | | |
| | Financial Agent Services | 3 | - | Unk | D/U/C | | | | | | $0.00 |
| | First Community Credit Union | 4 | - | $0.00 | D/U/C | | | | | | $0.00 |
| | Glass & Mirror | 5 | 2 | N/A | | Doc. 72 | 2/6/2019 | $17,021.24 | Secured | | $17,021.24 |
| | Harris County et al | 2 | - | $3,543.45 | - | 1 | 12/12/2018 | $405,317.63 | Secured | | $405,317.63 |
| | Harris County et al | 2 | - | $53,748.93 | - | | | | | | |
| | Harris County et al | 2 | - | $41,578.12 | - | | | | | | |
| | Harris County et al | 2 | - | $46,455.95 | - | | | | | | |
| | Harris County et al | 2 | - | $49,055.08 | - | | | | | | |
| | Harris County et al | 2 | - | $56,709.89 | - | | | | | | |
| | Harris County et al | 2 | - | $1,278.43 | - | | | | | | |
| | Harris County et al | 2 | - | $11,747.35 | - | | | | | | |
| | Harris County et al | 2 | - | $89,337.66 | - | | | | | | |
| | Harris County et al | 2 | - | $51,862.77 | - | | | | | | |
| | Kilgore Industries LP | 6 | 2 | $1,685.47 | - | 6 | 2/5/2019 | $16,461.60 | Secured | | Unk |
| | Kilgore Industries LP | | 2 | $0.00 | D/U/C | | | | | | |
| | Midland Loan Services | 7 | 1 | $50,488,334.82 | D | 3 | 1/2/2019 | $56,595,034.50 | Secured | | Unk |
| | OSG Services Inc. | | 2 | $20,371.03 | D/U/C | | | | | | $0.00 |
| | Quality Airflow | | 2 | $14,462.50 | D/U/C | | | | | | $0.00 |

| L REIT, Ltd. | | | Secured Claims: Classes 1 and 2 | | | | | | | | |

| Sch.# | Name | End-note | Class | Scheduled Claim Amount | D/U/C | POC# | Date Filed | Filed Claim Amount | Filed as Secured Priority Unsecured | Obj Doc# | Allowed Unsecured Claim Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Restoration Management 2013 Inc | | 2 | $1,948.50 | D/U/C | | | | | | $0.00 |
| | Tax Ease Funding LP | 4 | - | $0.00 | D/U/C | | | | | | $0.00 |

1. The claim of Bancorp South f/k/a Icon Bank is disputed by LREIT.  The Plan does not provide for payment of this claim.

2. The filed proof of claim is for all amounts owed to the respective taxing authority. Claims paid by Secured Noteholder on or about January 31, 2019 per Cash Collateral Order [Docket No. 44]

3. Debtors dispute amount is owed by L REIT.

4. L REIT believes that this claim has been paid in full, but the secured creditor has failed to release its deed of trust.  The Debtors do not propose paying these creditors in the Plan.

5. Glass and Mirror is scheduled as a general unsecured creditor.  No proof of claim has been filed, but it has filed a Notice of Perfection of Constitutional Lien [Docket No. 72] in the listed amount.

6. The filed proof of claim is for both scheduled debts, one of which is contested by the Debtors.  The amount of the liens filed by Kilgore totals $15,461.00.

7. This is the scheduled claim of the Secured Noteholder who L REIT believes is fully secured by the Real Properties.  The amount of the claim and the filed claim are disputed.  The Debtors will take all necessary action with respect to the claim.

| Sch.# | Name | End-note | Class | Unsecured Claim Amount | D/U/C | POC# | Date Filed | Filed Claim Amount | Filed as Secured Priority Unsecured | Obj Doc# | Allowed Unsecured Claim Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **L REIT, Ltd.** | | | **General Unsecured and Affiliate Claims: Classes 3, 7** | | | | | | | |
| | Adept Controls | | 3 | $259.80 | | | | | | | $259.80 |
| | American Fire Systems Inc | | 3 | $2,977.49 | | | | | | | $2,977.49 |
| | ASAP Security Services | | 3 | $487.12 | | | | | | | $487.12 |
| | Caldwell Companies | | 3 | $24,084.22 | | | | | | | $24,084.22 |
| | Classic Protection Systems Inc | | 3 | $404.09 | | | | | | | $404.09 |
| | Colliers International | | 3 | $43,468.73 | | | | | | | $43,468.73 |
| | CRA Houston | | 3 | $9,399.39 | | | | | | | $9,399.39 |
| | Electronic Security Solutions | | 3 | $65.00 | | | | | | | $65.00 |
| | Elite Protective Service | | 3 | $50,919.78 | | | | | | | $50,919.78 |
| | Environmental Coalition Incorporated | | 3 | $3,198.42 | | | | | | | $3,198.42 |
| | FacilitySolutionsgroup | | 3 | $3,877.56 | | | | | | | $3,877.56 |
| | Figure O Pest Control | | 3 | $200.27 | | | | | | | $200.27 |
| | Fora Financial | | 3 | Unk | D | | | | | | $0.00 |
| | Furlong Associates, Ltd. | | 7 | $828,058.45 | | | | | | | $828,058.45 |
| | Gregory J Dalton PC | | 3 | $15,260.00 | | | | | | | $15,260.00 |
| | HLG Landscape | | 7 | $51,598.96 | | | | | | | $51,598.96 |
| | Hollister Properties | | 7 | $310,578.14 | | | | | | | $310,578.14 |
| | Hollister Properties | | 7 | $334,093.40 | | | | | | | $334,093.40 |
| | Impak | | 3 | $812.88 | | | | | | | $812.88 |
| | Joel English | | 3 | Unk | | | | | | | Unk |
| | Johnstone Supply Blue Ash | | 3 | $10.83 | | | | | | | $10.83 |
| | K&R Mechanical Services LLC | | 3 | $7,893.50 | | | | | | | $7,893.50 |
| | Mattox Terrell & Associates | | 3 | $23,283.61 | | | | | | | $23,283.61 |
| | MN&P Construction Services | | 7 | $1,704,143.88 | | | | | | | $1,704,143.88 |
| | Moe Nasr | | 7 | $422,067.08 | | | | | | | $422,067.08 |
| | Otis | | 3 | $7,179.98 | | | | | | | $7,179.98 |
| | Paul Richard Electric | | 3 | $1,297.92 | | | | | | | $1,297.92 |
| | Professional Janitorial Service | | 3 | $91,586.76 | D/U/C | | | | | | | $0.00 |
| | Pyrotex Systems | | 3 | $4,074.00 | | | | | | | $4,074.00 |

3

| Sch.# | Name | End-note | Class | Unsecured Claim Amount | D/U/C | POC# | Date Filed | Filed Claim Amount | Filed as Secured Priority Unsecured | Obj Doc# | Allowed Unsecured Claim Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **L REIT, Ltd.** | | | **General Unsecured and Affiliate Claims: Classes 3, 7** | | | | | | | |
| | Rae Security | | 3 | $1,396.43 | | | | | | | $1,396.43 |
| 4.1 | Shooter and Lindsey Inc | | 3 | $34,384.49 | | 4 | 1/14/2019 | $29,334.63 | Unsecured | | $29,334.63 |
| | Siemen Industries Inc | | 3 | $483.48 | | | | | | | $483.48 |
| | Spring Glass & Mirror Ltd | | 3 | $15,110.62 | | | | | | | $15,110.62 |
| | Tenant Deposit/CAM Reconcilation Claims | | 3 | Unk | D/U/C | | | | | | Unk |
| | TLC Lock & Key | | 3 | $121.56 | | | | | | | $121.56 |
| | Touch Source LLC | | 3 | $288.00 | | | | | | | $288.00 |

**General Notes:**

Creditors with scheduled claims in unknown amounts will not be paid through the Plan.

4

| Beltway 7 Properties, Ltd. | | | | | | | Beltway's Claims: Classes 4, 6 | | | | |

| Sch.# | Name | End-note | Class | Scheduled As Secured Priority Unsecured | Unsecured Claim Amount | D/U/C | POC# | Date Filed | Filed Claim Amount | Filed as Secured Priority Unsecured | Obj Doc# | Allowed Unsecured Claim Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Annaly CRE Holdings LLC | 1 | 5 | Secured | $7,000,000.00 | | 7 | 3/19/2019 | $10,538,836.54 | | | $7,000,000.00 |
| | TROFLEB, L.L.C. | | 6 | Unsecured | Unk | | | | | | | $0.00 |
| | Schlam Stone & Dolan LLP | | 6 | Unsecured | Unk | | | | | | | $0.00 |
| | Edgar A. Goldberg | | 6 | Unsecured | Unk | | | | | | | $0.00 |
| | Dewey Pegno & Kramarsky, LLP | | 6 | Unsecured | Unk | D/U/C | | | | | | $0.00 |

1. The amounts allegedly due in the filed claim are disputed.  The Debtors will take all necessary action with respect to the claim.

**General Notes:**

Creditors with scheduled claims in unknown amounts will not be paid through the Plan.

Beltway expects that it it will incur a significant Administrative Tax Claim from the sale of the Real Properties.  The amount of such claim is unknown at this time.

# EXHIBIT C

# LIQUIDATION ANALYSIS

**L REIT, Ltd and Beltway 7 Properties, Ltd.  (Jointly Administered)**
**Case No. 18-31857**

| Assets: | | | | | |
|---|---|---|---|---|---|
| | Current FMV | Note | Liquidation Value | Note | Discount |
| Estimated Cash | $100,000.00 | | $100,000.00 | | 100.00% |
| Real Properties | $74,774,939.00 | 1 | $66,689,520.00 | 2 | 89.19% |
| | | | | | |
| Other Assets | Unk | 3 | Unk | | Unk |
| **Total FMV** | **$74,874,939.00** | | | | |
| **Total Liquidation Value** | | | **$66,789,520.00** | | |

**Notes on Assets:**

1. Current FMV based on Vaultion provided by Avison Young based on 79.31% occupancy, anticipated NOI of $3,738,747, and a cap rate of 5.00%.  The range of price based on going-in cap rates between 4.75% and 5.25% is between $71,000,000 and $78,500,00.

2. Liquidation Value based on Valuation provided by Avison Young based on prepretition occupancy of 77.64% and current NOI of $3,7667,924 and cap rate of 5.5%.

3. Other assets include miscellaneous litigation claims and proofs of claim owned by L REIT.  The amounts an collectibility of such claims are unknown.

| Creditor Payout Under Proposed Plan of Reorganization | | | | |
|---|---|---|---|---|
| | Note | Claim Amount | Amount Paid | Percentage Recovery |
| Secured Claim of Secured Noteholder | 1 | $50,608,757.79 | $50,608,757.79 | 100.00% |
| Secured Claims of M&M Lienholders | 2 | $70,264.87 | $70,264.87 | 100.00% |
| Chapter 11 Administrative Costs | 3 | $79,875.00 | $79,875.00 | 100.00% |
| General Unsecured Claims of L REIT | 4 | $367,920.68 | $367,920.68 | 100.00% |
| Secured Claim of Mezzanine Lender | 5 | $7,284,802.79 | $7,284,802.79 | 100.00% |
| General Unsecured Claims of Beltway 7 | | $0.00 | $0.00 | 100.00% |
| Claims of Affiliates of L REIT | 6 | $3,650,539.91 | $3,650,539.91 | 100.00% |
| **Total Distributed** | | | **$62,062,161.04** | |
| **Surplus/Deficet** | | | **$12,812,777.96** | |

**Notes on Creditor Payout Under Chapter 11**

1. Reflects the aggregate amount of pincipal and non-default interest  claimed by Secured Noteholder in its proof of claim. L REIT disputes the prepayment pentalities and other added costs allegedly owed under the claim.

2. Reflects the total amount of all M&M Liens regardless of whether disputed as well as filed claims.

3. Unpaid post-petition Chapter 11  fees & expenses for professionals and other administrative expenses accrued during the Chapter 11 case.  Also assumes Chapter 7 conversion as of April 1, 2019.

4. Reflects all scheduled and filed proofs of claim including disputes, unliquidated and/or contingent claims.

5. Reflects the principal amount claimed by the Mezzanine Lender in its proof of claim plus accured post-petition interest through March 11, 2019.  Additional post-petition interest will continue to accure.  The Debtors reserve their right to dispute default interest, the prepayment penalties and other added costs allegedly owed under the claim.

6. Debtors propose to pay affiliate claims of L REIT after all other claims which diverges from normal priority schemes under § 507.

**Creditor Payout Under Chapter 7 According to Priority under § 507**

**General Assumptions**

Forced Liquidation assumes conversion to Chapter 7, appointment of a Trustee, and use of 3rd party professionals, agents, brokers, liquidators, etc., up to a one year period. Figures based on conversion as of April 1, 2019.

| | Note | Claim Amount | Amount Paid | Percentage Recovery |
|---|---|---|---|---|
| Chapter 7 Administrative Costs | 1 | $2,581,317.48 | $2,581,317.48 | 100.00% |
| Chapter 11 Administrative Costs | 2 | $79,875.00 | $79,875.00 | 100.00% |
| Secured Claim of Secured Noteholder | 3 | $56,595,034.50 | $56,595,034.50 | 100.00% |
| Secured Claims of M&M Lienholders | 4 | $70,264.87 | $70,264.87 | 100.00% |
| General Unsecured Claims of L REIT | | $367,920.68 | $367,920.68 | 100.00% |
| Claims of Affiliates of L REIT | | $3,650,539.91 | $3,650,539.91 | 100.00% |
| Secured Claim of Mezzanine Lender | 5 | $10,538,836.54 | $3,444,567.56 | 32.68% |
| General Unsecured Claims of Beltway 7 | | $0.00 | $0.00 | 0.00% |
| **Total Distributed** | | | **$66,789,520.00** | |
| **Surplus/Deficet** | | | **($7,094,268.98)** | |

**Notes on Creditor Payout under Chapter 7**

1. Based a Chapter 7 trustee's sliding commission scale, estimated attorneys fees, costs of sale, taxes & expenses incurred during Chapter 7 case.

2. Unpaid post-petition Chapter 11 fees & expenses for professionals and other administrative expenses accrued during the Chapter 11 case. Also assumes Chapter 7 conversion as of April 1, 2019.

3. Reflects the amount claimed by Secured Noteholder in its proof of claim. During Chapter 7 the Secured Noteholder will also incur additional costs on its claim.

4. Reflects the total amount of all M&M Liens regardless of whether disputed as well as filed claims.

5. Reflect the amount claims by the Mezzanine Lender in its proof of claim. The Debtors reserve their right to dispute the prepayment penalties and other added costs allegedly owed under the claim.